**VALLEY NATIONAL BANK, a Banking Corporation, Plaintiff–Appellant,**

v.

**James ABDNOR, in his capacity as Administrator of the Small Business Administration, an agency of the United States Government, Defendant–Appellee.**

No. 89–1078.

United States Court of Appeals, Tenth Circuit.

Nov. 6, 1990.

Steven R. Rider, Rider & Woulf, Aurora, Colo. (Charles S. Unfug, Greeley, Colo., on the brief), for plaintiff-appellant.

Gary Fox, Sp. Asst. U.S. Atty., Washington, D.C., (Amy Golen, Sp. Asst. U.S. Atty., Washington, D.C.; Michael J. Norton, U.S. Atty., and J. Greg Whitehair, Asst. U.S. Atty., on the brief), for defendant-appellee.

Before BRORBY and ANDERSON, Circuit Judges, and THEIS,* District Judge.

THEIS, District Judge.

Plaintiff Valley National Bank ("the Bank" or "VNB") appeals from a judgment rendered after a bench trial. The dispute involves the refusal of defendant Small Business Administration ("SBA") to purchase its guaranteed portion of a defaulted loan. Our jurisdiction is conferred by 28 U.S.C. § 1291. We affirm.

I.

The agreement between the parties was made pursuant to the SBA's authority under 15 U.S.C. § 636 to participate in guaranteed loans to small businesses that would otherwise be unable to secure a loan from a lending institution. Upon approval of a loan, the SBA will enter into a "deferred participation" agreement, whereby it will purchase from the lending bank a portion of a loan in the event of default. The SBA and VNB executed a blanket "Loan Guaranty Agreement" in 1983 intended to govern future specific loans to be guaranteed by the SBA. The particular loan underlying this dispute was for a guaranty of 90% deferred participation and was finalized on April 22, 1986.

---

* The Honorable Frank G. Theis, District Judge, United States District Court for the District of Kansas, sitting by designation.

The nature of the enterprise underlying the guaranteed loan at issue was a cattle operation owned by Ed and Charlotte Miller under the name of Eagle Limousin Superior Genetics ("Eagle Limousin"). The Millers owned a herd of Limousin cattle, which are considered to be genetically superior to other commercial cattle. The operation for which the Millers sought financing was a new and innovative procedure whereby the superior offspring of the Limousin cattle could be produced at a much faster rate than normal. This procedure involved the artificial insemination of a donor Limousin cow and subsequent "embryo transfer." After artificial insemination, the resulting embryos could be flushed out of the "donor" cow and transferred to several non-Limousin "host" cows. In this way, a limited number of Limousin cows could be impregnated several times a year, and their genetic offspring could be brought to term by other cows.

The enterprise proposed by the Millers required a large amount of working capital to expand the already faltering Eagle Limousin operation. The Millers owned only Limousin cattle and proposed to lease a herd of host cows from other cattle operations. The venture also required certain additional equipment. The VNB had made a previous loan to the Millers that was outstanding at the time the Millers proposed the embryo transfer enterprise. Presumably because they already faced default on the prior loan, the Millers did not qualify for an additional loan, and the Bank attempted to enlist the approval of the SBA for a guaranteed loan. The SBA initially rejected the Millers' application but after reconsideration gave its approval for a loan in the amount of $332,800. The Bank made disbursements for the total amount of the loan from April 22, 1986 through November 22, 1986.

Although a limited number of embryos were successfully transferred, no Limousin calves were brought to term in this manner. The loan went into default on or about January 1, 1987, and the Bank made a demand for payment upon the SBA on June 1, 1987. The Bank contended that SBA was obligated to honor its agreement to guaranty the outstanding portion of the loan, which amounted to approximately $300,000. SBA defended by alleging that the Bank had failed to comply with the terms of the parties' agreement, thus discharging the SBA guaranty. The district court made oral findings of fact and conclusions of law to the effect that the Bank had violated the guaranty agreement, and that this violation excused SBA of its obligation to purchase the loan.

II.

We review the trial court's findings of fact under the clearly erroneous standard. Fed.R.Civ.P. 52; *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). The trial court's finding of a material breach of contract is a question of fact that is controlled by this standard of review. *Chaparral Resources, Inc. v. Monsanto Co.,* 849 F.2d 1286, 1289 (10th Cir. 1988); *Eastern Illinois Trust & Sav. Bank v. Sanders,* 826 F.2d 615, 616 (7th Cir. 1987). However, the appellate court is in as good a position as the trial court to interpret a written document. *DeBoer Construction, Inc. v. Reliance Ins. Co.,* 540 F.2d 486, 495 (10th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *see also Southwestern Stationery & Bank Supply, Inc. v. Harris Corp.,* 624 F.2d 168, 170 (10th Cir.1980). Thus, questions of interpretation are not limited by the clearly erroneous standard unless the trial court relied on extrinsic evidence for its interpretation of an ambiguous written contract. *Cavic v. Pioneer Astro Indus., Inc.,* 825 F.2d 1421, 1424 (10th Cir.1987).

As with the trial court, we look first to the written agreement of the parties to determine the bargained-for objectives of the parties. The written agreement of the parties is reflected primarily in the 1983 blanket Loan Guaranty Agreement and in the April 7, 1986 Authorization and Loan Agreement covering this specific loan. The 1983 agreement provides that "[a]ll servicing actions shall be the responsibility of the holder who shall follow accepted

standards of loan servicing employed by prudent lenders generally,...." R.Vol. I, Doc. 1, Eht. A, ¶ 6. The April 1986 Authorization agreement further states that it is subject to the provisions of the 1983 guaranty agreement between the Bank and the SBA. R.Vol. I, Doc. 1, Eht. B, ¶ 2(a). In addition, the 1983 blanket agreement expressly subjects guaranteed loans by the SBA "to SBA's Rules and Regulations as promulgated from time to time." The parties agree that the critical regulation governing this dispute is found at 13 C.F.R. § 120.202–5:

> SBA shall be released from obligation to purchase its share of the guaranteed loan unless the Lender has substantially complied with all of the provisions of these regulations, the Guaranty Agreement and the Loan Authorization, and has not failed to disclose material facts, and has made no material misrepresentations to SBA with respect to the loan; or upon the happening of any one or more of the following events:
>
>> (a) *Defective Closing.* Failure of the Lender to close and disburse the loan substantially in accordance with the terms and requirements of the loan instruments (including the loan authorization), or to service the loan in a prudent manner, either of which may result in a substantial loss on the loan;
>> . . . .

Accordingly, the primary issue addressed during trial was whether VNB had serviced the loan to the Millers in a manner employed by prudent lenders generally.[1]

The trial court found that the evidence was "clear and convincing" that the Bank had failed to follow reasonably prudent banking methods, citing several factors in support of this conclusion: the Bank took no measures to verify the number of suc- cessful embryo transfers and made no effort to verify that any of the transferred embryos, in which the Bank held a first lien interest, were brought to term; the Bank failed to perfect its security interest in the unborn cattle or to ascertain what interest the owners of the host cattle would have in the unborn embryos; after the Bank had discovered in October 1986[2] that the Millers had deceived it as to the number of actual successful embryo transplants, the Bank did not inform SBA and indeed continued to pay out additional disbursements to the Millers; the Bank did not know the location of the Millers' existing Limousin cattle, nor did it make any effort to locate, identify or inspect these cattle, which served to secure a second lien held by the SBA on this loan[3]; the Bank took no action after the Millers had failed to submit financial statements as required under the agreement. Considering these various omissions, the trial court concluded that the Bank not only failed to follow reasonably prudent banking methods in servicing the Miller loan, but that it acted with "gross negligence" and "almost reckless indifference."

■ We do not find the trial court's conclusions on this issue to be clearly erroneous. Indeed, a review of the record submitted on appeal reveals substantial evidence to support the finding that the Bank did not act reasonably with respect to the loan. *See also Citizens Marine Nat'l Bank v. United States Dep't of Commerce,* 854 F.2d 223, 228 (7th Cir.1988) (cumulative effect of various imprudent acts by bank excused SBA from honoring guaranty agreement), *cert. denied sub nom., Bank One, Stevens Point, NA v. United States Dep't of Commerce,* 489 U.S. 1053, 109 S.Ct. 1312, 103 L.Ed.2d 582 (1989); *Pittsburgh Nat'l Bank v. Abdnor,*

---

1. The trial court found no material omissions on the part of the Bank at the time of SBA's approval of the loan that would excuse SBA from its guaranty obligation. SBA does not challenge this finding on appeal.

2. At trial the parties disputed the time at which the Bank discovered that the Millers had misrepresented the number of successful embryo transfers. The trial court expressly found that

Mr. Patterson, the Bank's president, learned in October 1986 that only 50 transplants had been successful, when at least 150 to 180 were necessary for the venture to succeed. Plaintiff does not challenge this finding on appeal.

3. The Limousin cattle herd serving as collateral for this loan was lost and had not been accounted for as of the time of trial.

898 F.2d 334 (3d Cir.1990) (bank failed to service loan prudently by delaying the cashing of a check). The Bank calls attention to the fact that there were no specific provisions in the Loan Authorization Agreement that required the measures not taken by the Bank. This argument assumes that all actions defining the prudent lender must be specifically set forth in the agreement before they may be expected of the Bank. Although the 1986 Loan Authorization Agreement did impose some specific servicing actions upon the Bank, this does not preclude the possibility that other unspecified actions might also be required of the prudent lender. A contrary interpretation would require us to ignore as mere surplusage the contractual requirement of prudent servicing. The Bank also argues that it serviced the Miller loan with the same level of attention and professionalism as it uses in servicing other non-SBA loans. This argument ignores that the Loan Agreement establishes the standard governing the Bank's conduct with respect to SBA loans to be that of "prudent lenders *generally.*" This contractual standard is also consistent with the SBA's Standard Operating Procedure ("S.O.P.") 50–50–3 ¶ 62(b), which states that "each lender is expected to administer the SBA guaranteed loans in its portfolio with *at least* the same level of case control, attention and professionalism that it applies to its direct (non-SBA) loan portfolio." (emphasis added). Thus, even assuming the validity of the Bank's assertion, it is no defense that the Bank may normally service its non-SBA loans in an imprudent manner.

■ The Bank alleges that the trial court's interpretation of the parties' agreement violated the parol evidence rule by relying on evidence extrinsic to the written documents forming the contract. Specifically, the trial court referred to a letter introduced over plaintiff's objections from Mr. Patterson, the president of VNB, to Mr. Muller of the SBA. In this letter, which predated the April 7, 1986 Authorization Agreement, Mr. Patterson assured Mr. Muller that the Bank would consult with the owners of any host cows and obtain a written understanding from these prospective commercial cow operators regarding the Bank's security interest in the embryos. Mr. Patterson also stated that the Bank would search the county records for any liens on the host cows and, if liens were found, would obtain "a written acknowledgment" of the Millers' ownership of the embryos and the Bank's security interest in the embryos. The Bank took none of these actions.

Plaintiff's argument has no merit. Although the trial court referred to the letter written by the Bank's president to the SBA, it did not do so to alter or contradict the terms of the parties' written agreement. Rather, the letter was merely one piece of evidence considered by the trial court to aid in its factual inquiry into the specific actions required of the prudent lender. If a contractual term is ambiguous, resort may be had to extrinsic evidence to determine the meaning of that term. *Devine v. Ladd Petroleum Corp.,* 805 F.2d 348, 349 (10th Cir.1986); *Amoco Prod. Co. v. Western Slope Gas Co.,* 754 F.2d 303, 309 (10th Cir.1985). The trial court did no violence to the parol evidence rule by considering this letter for the purpose of ascertaining the appropriate conduct of "prudent lenders generally."

■ We next consider the trial court's conclusion that the Bank's various forms of inaction excused the SBA from buying its guaranteed portion of the loan. The Bank argues that the SBA may refuse to honor its guaranty agreement only when the specific acts or inaction on the part of the Bank resulted in an identifiable and substantial loss. The trial court interpreted the agreement so as not to require that a specific loss on the loan be traceable to the Bank's negligent servicing. In support of its position, the Bank relies on language contained in the governing regulation and on the SBA's own written procedure. Among the events excusing the SBA from its guaranty obligation is the lender's failure "to close and disburse the loan substantially in accordance with the terms and requirements of the loan instruments ... or to service the loan in a prudent manner, *either of which may result in a substan-*

*tial loss on the loan."* 13 C.F.R. § 120.202–5(a) (emphasis added). This language is repeated in S.O.P. 50–50–3 ¶ 76(a), which states that the SBA may deny liability if the lender fails "to close/disburse substantially in compliance with the Authorization or servicing in a substantially negligent manner, *either of which may result in a substantial loss on the loan."* The Bank contends that the loss on the loan would have resulted even if it had serviced the loan in the manner found wanting by the trial court. According to plaintiff, the Bank could not have prevented the ultimate loss on the loan by performing the various acts cited by the trial court, because the only reasons for the failure of Eagle Limousin were Miller's dishonesty and the inherent risk in this experimental venture.

This defense must fail for several reasons. First, the language relied upon by the Bank states that the SBA will be excused of liability if the negligent conduct *"may"* result in a substantial loss on the loan." 13 C.F.R. § 120.202–5(a) (emphasis added). In addition, S.O.P. 50–50–3 ¶ 76(a) emphasizes that an actual loss is not necessary, stating that "[t]he combination of a substantial failure by participant which results, *or may result,* in a substantial loss" is a predicate to an SBA denial of liability. Thus, the trial court's interpretation of the terms of the agreement on this issue is supported by the regulations forming a part of the agreement. Under the SBA regulations and policy statements relied upon by the parties,[4] it is sufficient if the lender's actions are of such a nature that they may be expected to result in a substantial loss on the loan.

■ Even assuming the validity of the Bank's interpretation, the trial court found that the Bank's failure to service this loan in a prudent manner did result in a substantial loss. The trial court stated:

The loss here resulted from the failure completely of Miller to carry out the venture that was outlined in great detail in the submission to the SBA, to the bank and to the SBA. All of this was contingent on—even the creation of the collateral that was really to support this loan was contingent on good management by him of the existing herd and of the efforts to increase the herd through the embryo transplant system. So what happened here is a total failure of that venture through gross mismanagement by the borrower *without adequate control and monitoring by the lender bank,* and that's a loss. And it is the loss which excuses the SBA from its obligation to repurchase.

R.Vol. III, at 482. (emphasis added). It is clear that the trial court found that the failure of the venture was due at least in part to the negligent servicing of the Miller loan. The Bank concedes that the business failed because Miller did not perform as promised. Reply brief at 15. And the trial court found a causal connection between the failure of Miller to perform and the Bank's numerous instances of inadequate monitoring of the loan. The Bank also discovered in October 1986 that the Millers had performed only 50 embryo transfers, contrary to their earlier representations to the president of VNB, yet the Bank continued to make disbursements of approximately $57,000 after it had discovered the misrepresentations of the Millers. Finally, the Bank's failure to inform itself of the location of the Limousin herd and the failure to perfect the second lien security interest in this herd resulted in the loss of this valuable collateral. Given these considerations, we cannot say that the trial court clearly erred in finding that the Bank materially breached its agreement with SBA, thereby excusing SBA of its guaranty obligation.

---

4. We are aware that a contrary interpretation of SBA standard operating procedure was upheld by the Seventh Circuit in *Eastern Illinois Trust & Savings Bank v. Sanders,* 826 F.2d 615, 617 (7th Cir.1987) (a resulting substantial loss on the loan is a prerequisite to repudiating an SBA guaranty). In *Eastern Illinois* the court referred to S.O.P. 50–53–3 ¶ 56, which is neither cited by the parties nor provided for our review. In addition, the *Eastern Illinois* court appears to have endorsed this interpretation as a finding of fact by the trial court that was not clearly erroneous. Necessarily, we are unable to express a view on the correctness of this interpretation of S.O.P. 50–53–3 ¶ 56, and our review is restricted to the documents and findings of fact before us.

**134**

The judgment of the district court is AFFIRMED.