**MORSE DIESEL INTERNATIONAL, INC., d/b/a AMEC Construction Management, Inc., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Nos. 99–279C, 99–529C, 99–530C, 00–531C, 03–1537C.

United States Court of Federal Claims.

July 15, 2005.

Craig S. King, Arent Fox, PLLC, Washington, D.C., counsel for plaintiff.

Domenique Grace Kirchner, United States Department of Justice, Washington, D.C., counsel for defendant.

**MEMORANDUM OPINION REGARDING THE GOVERNMENT'S ANTI–KICKBACK ACT OF 1986 COUNTERCLAIMS**

BRADEN, Judge.

In 1986, Congress undertook a major revision and expansion of the Anti–Kickback Act of 1946, 60 Stat. 37, because kickbacks had become such a "pervasive problem in Federal procurement." *See* H.R. REP. NO. 99–964, at 4, *reprinted in* 1986 U.S.C.C.A.N. 5960, 5961. Kickbacks were viewed as a form of commercial bribery:

> Whatever form they take, all kickbacks serve to undermine Federal procurement . . . . Furthermore, inflated contract pricing is not their only effect. Kickback activity corrupts the Federal procurement system. It drives out honest competitors and destroys the markets in which the government must bargain.

H.R. REP. NO. 99–964, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5962.

This case is the first adjudicated by the United States Court of Federal Claims under the comprehensive scope of the Anti–Kickback Act of 1986, 41 U.S.C. §§ 51–58 ("Anti–Kickback Act").

## FACTUAL BACKGROUND [1]

### A. Regarding March 2004 Transfer Of Interest And Potential Joinder Of Persons Needed For Just Adjudication.

From 1990 to January 1995, Morse Diesel International, Inc. ("MDI") was a Delaware corporation engaged in construction management and general contracting work on large scale projects for the private and public sectors and a joint venture: 50% of which was owned by Morse/Diesel, Inc. and 50% by AMEC Holdings, Inc., a wholly owned United States subsidiary of a corporation known as AMEC, p.l.c. *See* Third Am. Counterclaims. ¶ 114 at 36; *see also* Gov't PF ¶ 8. AMEC, p.l.c. is now a publicly held international "support services" company in the engineer and technical services, oil and gas, and project scheduling business, traded on the London Stock Exchange, with net operating assets at the close of 2004 of £286.8 million and an operating profit of £149.6 million. *See* AMEC, p.l.c.2004 ANNUAL REPORT at 1, 25, 35.

This Complaint was filed in the United States Court of Federal Claims in May 1999 by MDI. *See* Compl. At least by August 2001, however, MDI was doing business as AMEC Construction Management, Inc. ("ACMI"), with principal offices located in New York City.

In preparing this Memorandum Opinion the court's independent research has revealed that on or about March 11, 2004, AMEC, p.l.c. the parent company of MDI d/b/a ACMI announced:

> The strategic review of the U.S. Construction Management business has recently been concluded. With the risk and low margin on this activity leading to losses in recent years, and with the business no longer being consistent with AMEC's focus on engineering and technical services, AMEC has decided that a controlled exit from this market is in the best interests of shareholders.

> The exit from this business, together with the disposal of 51% of Spie Batignolles, the regional construction business in Continen-

1. The facts discussed herein were derived from the: May 5, 1999 Complaint ("Compl."); United States's ("the Government") July 23, 1999 Answer ("Answer"); November 8, 1999 Government's Affirmative Defenses and Counterclaims ("First Counterclaims"); May 5, 2000 Government's Additional Counterclaims (involving doorframes) and Special Plea in Fraud ("Supp.Counterclaims"); January 10, 2001 MDI Answer to May 5, 2000 Government's Counterclaims ("Doorframes Answer"); May 10, 2001 Government (First) Amended Counterclaims ("(First) Am. Counterclaims"); November 1, 2001 MDI Motion to Dismiss the Government's Seventh Counterclaim ("Nov. 1, 2001 MDI Mot. to Dismiss"); November 20, 2001 Government's (Second) Amended Counterclaims ("(Second) Am. Counterclaims"); December 7, 2001 Government's Opposition to MDI's November 1, 2001 Motion to Dismiss ("Gov't Opp.") and Motion for Partial Summary Judgment Regarding the Seventh Counterclaim, together with Exhibits 1–19 thereto ("Gov't Opp. Ex. ___"); December 7, 2001 Government Proposed Findings of Uncontroverted Fact ("Gov't PF"); February 27, 2002 MDI Reply to Government's Opposition and Response to Partial Summary Judgment ("MDI Reply"), together with Genuine Issues and MDI's Proposed Findings of Uncontroverted Fact ("MDI's PF"); March 18, 2002 MDI Answer to Government's (Second) Amended Counterclaims; August 21, 2002 MDI's Surreply ("MDI Surreply") and Exhibit A ("MDI Ex. A"); July 9, 2002 Government's Reply to MDI's February 27, 2002 Opposition, together with Appendix Exhibits 20–

38 ("Gov't Opp. Ex. ___"); October 7, 2002 Government's Sur-rebuttal and Opposition to MDI's Motion for Summary Judgment Regarding the Seventh Counterclaim ("Gov't Surrebuttal"), together with Exhibits 39–51 ("Gov't Op. Ex. ___"); October 23, 2002 (Third) Amended Counterclaims ("(Third) Am. Counterclaims"); November 27, 2002 MDI Amended Answer to the Government's October 23, 2002 Amended Counterclaim ("Am.Answer"); September 5, 2003 MDI d/b/a ACMI Opposition to Government's Motion for Partial Summary Judgment ("Pl. Op.") and Response to Government's Proposed Findings of Uncontroverted Fact ("MDI d/b/a ACMI Add'l PF"), together with three volumes of Exhibits ("MDI d/b/a ACMI Ex. ___"); November 21, 2003 Government's Answer and Counterclaim in Case No. 03–1537C; January 12, 2004 MDI d/b/a ACMI Answer to Government's November 21, 2003 Counterclaims; January 23, 2004 Government Reply Memorandum ("Gov't Reply") and Appendix Volume 7 ("Gov't App. Vol. 7"); January 23, 2004 MDI d/b/a ACMI Response to Government's Proposed Findings of Uncontroverted Fact ("Pl. Resp. to Gov't PF"); February 20, 2004 Transcript of Oral Argument ("TR ___"); March 1, 2004 Supplemental Declaration of James Brogan ("Brogan Decl."); August 30, 2004 MDI d/b/a ACMI Supplemental Opposition ("Pl.Supp.Opp."); October 6, 2004 Government Response thereto ("Gov't Supp. Opp.").

tal Europe, will eliminate what in recent years has been nearly £1 billion of activity with negligible impact on operating profit.

The U.S. Construction Management business operates through several regional centres. Offices in Washington DC and Florida, together with two ongoing projects, have been sold to Facchina–McGaughan, a joint-venture between the AMEC regional management and the Facchina group. The value of the transaction is minimal. This management team has a good track record and intends to build up the activities they have acquired from AMEC, creating opportunities for people currently employed by that business.

Offices in New York, Boston, San Francisco and Chicago will be either closed or sold and existing contractual commitments completed in a process expected to be concluded over the next two to three years.

Net capital employed in the total U.S. Construction Management business of about U.S. $40 million is expected to be released over the next two to three years and will be retained by AMEC.

AMEC will include in its results for the year ending 31 December 2004 an exceptional charge of about £15 million to cover the net costs expected to be incurred in exiting the U.S. Construction Management business. In addition, goodwill of £11 million previously written off to reserves will be required to be written off in the profit and loss account, but without further impact on the balance sheet.

http://www.amec.com/news/mediarelease-details.asp?Pageid=34 & MediaID=881 at 1–2.[2]

MDI d/b/a ACMI was sold by AMEC, p.l.c. to Facchina–McGaughan LLC, a joint venture formed by Paul V. Facchina, Sr. of LaPlata, Maryland and A.S. McGaughan, Jr., the former head of ACMI's Southeastern Division, for a "minimal" amount. *See* http://www.amec.com/news/mediarelease-

details.asp?pageid=34 & mediaID=881 at 1–2; *see also* http://www.southeast.construction. com/news/florida/archive/0407.asp.

On February 20, 2004, the court heard oral argument on pending substantive motions, including MDI d/b/a ACMI's Motion to Dismiss the Government's Anti–Kickback Act Counterclaim and the Government's Motion for Partial Summary Judgment regarding the same. Mr. Craig S. King, Esquire, Arent Fox, PLLC, counsel for MDI d/b/a ACMI, and Mr. John Onnembo, Esquire, ACMI's General Counsel, appeared before the court. *See* TR at 3. In light of representations made at the argument that MDI d/b/a ACMI was an ongoing company and the fact that the court had scheduled several upcoming trials, the court advised the parties that it likely would not be able to rule on the pending motions in the near future. *See* TR at 108–09. Neither party raised any concerns or objected. Within three weeks, however, AMEC, p.l.c. sold MDI d/b/a ACMI without notifying the court.

On April 23, 2004, the court convened a telephone status conference at which counsel for MDI d/b/a ACMI opposed the Government's March 11, 2004 Motion to Stay Discovery, which the court did not grant. *See Morse Diesel, Inc. v. United States,* No. 99–279C (Fed.Cl. Apr. 28, 2004) (Order postponing a ruling on the Motion to Stay Discovery until resolution of the Motions for Summary Judgment). In addition, the location and security of certain discovery subject to MDI d/b/a ACMI's February 6, 2004 document request was discussed. *Id.* At that conference, counsel for MDI d/b/a ACMI again failed to inform the court of the fact that MDI d/b/a ACMI had been sold. Nor did counsel inform the court of that event in: Plaintiff's Opposed December 3, 2004 Motion for Extension of Time; Plaintiff's December 15, 2004 Opposition to Defendant's Motion to Transfer and Consolidate; Plaintiff's February 25, 2005 Motion for Leave to File a Supplemental Brief in Opposition to Defendant's Motion to Transfer and Consolidate; or Plaintiff's March 29, 2005 Supplemental Brief in Opposition to Defendant's Motion to

2. In the same media release, AMEC, p.l.c. announced that it recently won three contracts through a joint venture known as Fluor AMEC

LLC for reconstruction work in Iraq with a total value up to $1.6 billion, of which $.8 billion is AMEC, p.l.c.'s share. *Id.* at 1.

Transfer and Consolidate.[3]

Therefore, before the court enters an order regarding the Government's Anti–Kickback Act counterclaims or adjudicates other pending substantive motions, the court requests that the Government ascertain whether the MDI d/b/a ACMI is still a viable legal entity and has sufficient assets to satisfy the relief requested by the Government's counterclaims and advise the court what legal entity or individuals have assumed the liabilities of MDI d/b/a ACMI. The court also requests the Government's views as to whether joinder of AMEC, p.l.c. and/or other parties now is required for "just adjudication." *See* RCFC 19(a).

**B. May 5, 1999 Complaint For Breach Of Contract And Breach Of Obligation Of Good Faith And Fair Dealing Regarding September 28, 1995 Contract No. GS06P95GZC0501 (Phase II) Of The St. Louis Federal Courthouse.**

On July 15, 1994, the General Services Administration ("GSA") awarded MDI Contract No. GS06P94GYC0037 to excavate the building site and construct a foundation and core wall for the Thomas F. Eagleton Federal Courthouse in St. Louis, Missouri ("St. Louis Federal Courthouse"). Third Am. Counterclaims ¶ 6 at 2. The contract was awarded on a fixed-price basis for $20,343,186 ("Phase I Contract"). *Id.* On September 29, 1995, GSA awarded MDI Contract No. GS06P95GZC0501 to complete construction of the St. Louis Courthouse on a fixed-price basis for $165,102,792 ("Phase II Contract"). *See* Case No. 99–529 Compl. ¶¶ 7–8. The Invitation for Bid included Option 8 for the build-out of Level II, with a separate price of $1,900,000. *See* Compl. ¶ 4 at 2. On October 18, 1995, GSA issued a Notice to Proceed to MDI with Phase II, but since preliminary work was to be undertaken offsite, the site would not be available until March 8, 1996. *Id.* ¶ 6 at 2.

Several months later, in June 1996, GSA informed MDI that it had decided to delete the Option 8 build-out and would revise the plans for Phase II. *Id.* ¶ 7 at 2–3. In July 1996, GSA issued a Request for Change Proposal P–24 and Price to Be Determined Later Notice for P–24, with a $0 designation. *Id.* ¶ 9 at 3. GSA advised MDI that the $1,900,000 amount included in Option 8 for the Phase I contract price now should be deleted from the $165,102,792 fixed-price for Phase II and that the reduction was to be treated as a "partial termination for convenience of the Government." *Id.*

In November 1996, MDI sent GSA a proposal, pursuant to the Changes Clause of the Phase II Contract, that proposed to reduce the Phase II contract price by $1,397,305, an amount that was "equal to the costs MDI would have incurred to perform the work deleted by P–24," but which compensated MDI for preliminary work done on Option 8 between October 18, 1995 and July 1996 when the Request for Change Proposal was issued. *Id.* ¶ 10 at 3. On November 26, 1996, GSA requested that MDI submit a revised price proposal. *See* Compl. ¶ 11 at 3. Accordingly, in December 1996, MDI resubmitted the "original price proposal with an explanation and justification for calculating the adjustment under the Changes Clause." *Id.* ¶ 12 at 3. Despite a January 7, 1997 meeting, where MDI assumed that GSA understood MDI's "pricing method," on February 13, 1997, GSA issued a Notice of Partial Termination regarding the Option 8 Level II build-out and re-announced GSA's intent to deduct $1,900,000 from the $165,102,792 fixed-price contract. *Id.* ¶¶ 13–14 at 4. On February 21, 1997, MDI rejected GSA's Notice of Partial Termination. *Id.* ¶ 15 at 4.

Although MDI thought there was an apparent agreement on a "deduction less than the bid Option 8," on July 25, 1997, in fact, GSA rejected the "negotiated credit amount" and reaffirmed the February 13, 1997 Notice of Partial Termination and advised MDI to submit a price proposal, pursuant to the Ter-

---

3. ACMI also did not inform the Honorable Catherine B. Hyatt of the General Services Administration Board of Contract Appeals ("GSBCA") of this event at the time of filing GSBCA No. 16503 or at anytime thereafter. *See, e.g.,* ACMI's Motion to Dismiss and/or Strike Counterclaims, Affirmative Defenses, *Morse Diesel, Inc. v. United States,* GSBCA No. 16503 (GSBCA Jan. 10, 2005).

mination for Convenience Clause. *Id.* ¶ 16 at 4. On July 28, 1997, GSA issued a Change Proposal P–98 reinstating Option 8, but for a different configuration. *Id.* ¶ 17 at 4. Thereafter, MDI submitted a proposed price for this reconfigured work. *Id.*

On January 30, 1998, MDI informed GSA that the $1,397,305 proposed price reduction was MDI's Termination of Convenience proposal, if GSA decided to proceed in this manner, rather than treating the situation as a "work scope" change. *Id.* ¶ 18 at 4–5.

It appears that GSA ignored MDI's proposal and issued a unilateral modification of PCG8 on March 10, 1998 to decrease the Phase II Contract price by $1,900,000. *Id.* ¶ 19 at 5. On April 9, 1998, MDI submitted a certified claim to GSA in the amount of $467,659. *Id.* ¶ 20 at 5. On May 12, 1998, a GSA Contracting Officer issued a Final Decision denying MDI's claim and request to consider the deduction as a change of work, rather than a partial Termination for Convenience. *Id.* at ¶ 21 at 5.

On May 5, 1999, MDI timely filed a Complaint in the United States Court of Federal Claims, docketed as Case No. 99–279C, alleging a breach of contract and breach GSA's obligation of good faith and fair dealing arising out of the Phase II Contract for the construction of the St. Louis Federal Courthouse, seeking damages of $467,659, plus interest, pursuant to the Contract Disputes Act, 41 U.S.C. § 609(a). *See* Compl. ¶¶ 28, 33 at 6–7.

### C. November 20, 2001 (Second) Amended Counterclaims Alleging A Violation Of The Anti–Kickback Act Of 1986.

On November 20, 2001, the Government filed (Second) Amended Counterclaims in this action, Case No. 99–279C, that alleged additional facts to support a counterclaim asserting violations of the Anti–Kickback Act arising from MDI and its parent, AMEC, p.l.c.'s, direct involvement in originating and orchestrating kickbacks paid by Willis Corroon Corporation ("Willis Corroon") and Rollins, Hudig, Hall ("RHH"), later known as AON. *See* Second Am. Counterclaims ¶ 157 at 45; *see also id.* at ¶¶ 156, 58–59 at 44–45. Those facts involve MDI's February 15, 1995

Contract No. GS09P95KTC0010 and July 19, 1995 Contract No. GS09P95KTC0032.

### 1. February 15, 1995 Contract No. GS09P95KTC0010 United States Customs House In San Francisco.

On February 15, 1995, GSA awarded MDI Contract No. GS09P95KTC0010 at a fixed price of $12,220,188, to conduct seismic and electrical upgrades at the United States Customs House in San Francisco. *See* Third Am. Counterclaims ¶ 10 at 3.

### 2. July 19, 1995 Contract No. GS09P95KTC0032 United States Courthouse And Federal Building In Sacramento.

On July 19, 1995, GSA awarded MDI Contract No. GS09P95KTC0032 at a fixed price of $92,609,000 to construct the core and shell of the United States Courthouse and Federal Building in Sacramento. *Id.* ¶ 9 at 3.

### 3. The Kickback Scheme Involved At Least Government Contracts Awarded To MDI In The Amount Of $290 Million.

From approximately 1990 to January 1995, MDI was a joint venture: 50% of which was owned by Morse/Diesel, Inc. and 50% by AMEC Holdings, Inc., a wholly owned United States subsidiary of a United Kingdom corporation known as AMEC, p.l.c. *Id.* ¶ 114 at 36; *see also* Gov't PF ¶ 8 at 3. AMEC, p.l.c.'s contribution to the joint venture was to provide surety agreements for indemnification against any losses that might be incurred for performance and payment bonds that AMEC, p.l.c. issued on behalf of MDI. *See* Gov't PF ¶ 9. Before bidding on any contract requiring a bond, however, MDI was required to seek prior approval of AMEC, p.l.c. or one of its affiliates. *See* Gov't PF ¶ 9 at 3; Gov't Opp. Ex. 3 (Critchlow Dep. at 32–33); Gov't Opp. Ex. 4. AMEC, p.l.c. also had the right to approve MDI's choice of bond broker. *See* Gov't PF ¶ 9 at 4; Gov't Opp. Ex. 2 (Bardsley Dep. at 79–80). Sometime in 1990, a brokerage firm known as Willis Corroon was appointed by AMEC, p.l.c. as the exclusive provider of performance and pay-

ment bonds for MDI. *See* Gov't PF ¶ 10 at 4. In 1993, Willis Corroon proposed to split fee commissions with MDI. *See* Gov't PF ¶ 11 at 4; Gov't Opp. Ex. 5 (Romano Dep. at 92).

At MDI's February 17, 1993 Board of Directors' meeting, MDI and Willis Corroon proposed that AMEC, p.l.c. cease doing business with a United Kingdom bond broker and instead spilt any future fee commissions earned on MDI bonding with MDI, since Willis Corroon only could split commissions with another licensed broker in the United States. *See* Second Am. Counterclaim ¶ 115 at 36; *see also* Gov't PF ¶ 12 at 5–6; Gov't Opp. Ex. 2 (Bardsley Dep. at 80–82); Gov't Opp. Ex. 6. Thereafter, AMEC, p.l.c. was paid 50% of the fee commissions earned by Willis Corroon on MDI contracts in exchange for an exclusive arrangement for MDI bond business, including at least the bonds required by MDI in connection with Phase I of the St. Louis Courthouse, San Francisco Customs House, and Sacramento Courthouse projects. *See* Gov't PF ¶ 13; Gov't Opp. Ex. 2 (Bardsley Dep. at 101–02); Gov't Opp. Ex. 5 (Romano Dep. at 93–94).

This commission-splitting agreement was in force until mid–1995,[4] when MDI obtained AMEC, p.l.c.'s approval to appoint RHH, subsequently known as AON, as MDI's new exclusive bond dealer. *See* Gov't PF ¶¶ 18–19; Gov't Opp. Ex. 2 (Bardsley at 131); *see also* (Second) Am. Counterclaims ¶ 116 at 37. Many of the RHH/AON employees previously worked at Willis Corroon and had participated in the prior fee commission-splitting agreement that was continued by RHH/AON. *See* Gov't PF ¶¶ 15–16; Gov't Opp. Ex. 2 (Bardsley Dep. at 86, 112–13); *see also* (Second) Am. Counterclaims ¶ 17 at 37.

Thereafter, with MDI's knowledge and approval, Willis Corroon and RHH split commissions on the bonds provided to MDI with AMEC, p.l.c. at least with regard to the July 5, 1994 Phase I Contract at the St. Louis Federal Courthouse; the February 15, 1995 upgrades performed on the U.S. Customs House in San Francisco; and the July 19,

1995 construction of the United States Courthouse and Federal Building in Sacramento. *See* Gov't PF ¶ 19; Gov't Opp. Ex. 5 (Romano Dep. at 81); Gov't Opp. Ex. 12; *see also* (Second) Am. Counterclaims ¶ 118 at 37.

The Phase I and Phase II Contracts with MDI for construction of the St. Louis Courthouse, the construction of the United States Courthouse and Federal Building in Sacramento, and the upgrades to the U.S. Customs House in San Francisco included a specific provision requiring MDI to comply with the Anti–Kickback Act. *See* Gov't PF ¶ 7; Gov't Opp. Ex. 1.

The fee commission-splitting agreement continued at least until January 2000. *See* Gov't PF ¶ 20; Gov't Opp. Ex. 5 (Romano Dep. at 87); *see also* (Second) Am. Counterclaims ¶ 117 at 37.

## PROCEDURAL HISTORY

On May 5, 1999, MDI timely filed a Complaint in the United States Court of Federal Claims, docketed as Case No. 99–279C, alleging a breach of contract and breach of GSA's obligation of good faith and fair dealing arising out of the construction of the St. Louis Federal Courthouse seeking damages of $467,659, plus interest, pursuant to the Contract Disputes Act. The case was assigned to the Honorable Loren A. Smith, then the Chief Judge.

On July 23, 1999, the Government filed an Answer. On October 12, 1999, the court entered an Order setting a deadline of January 3, 2000 for discovery and March 1, 2000 for dispositive motions. On November 1, 1999, the Government filed a Motion for Leave to File Affirmative Defenses and Counterclaims, wherein five counterclaims were asserted pursuant to: the False Claims Act, 31 U.S.C. §§ 3729, *et seq.;* the Forfeiture of Fraudulent Claims Act, 28 U.S.C. § 2514; and under the common law breach of contract and equitable claims for payment

---

**4.** In January 1995, AMEC, p.l.c. purchased Morse/Diesel, Inc.'s 50% interest in MDI, resulting in MDI becoming a wholly-owned subsidiary of AMEC Holdings, Inc., a wholly-owned subsidiary of AMEC Property and Overseas Invest-

ments, Ltd., that in turn was a wholly-owned subsidiary of AMEC, p.l.c. *See* Gov't PF ¶ 8; Gov't Opp. Ex. 2 (Bardsley Dep. at 16–18, 30–32); Gov't Opp. Ex. 3 (Critchlow Dep. at 34–36); *see also* Second Am. Counterclaims ¶ 114 at 36.

under mistake of fact and unjust enrichment.[5]

On May 4, 2000, the Government filed a Motion to Consolidate · Case No. 99–279C with Case No. 99–529C and Case No. 99–530C. On May 5, 2000, the Government filed a Motion for Leave to File an Amended Answer to assert additional counterclaims "involving doorframes" and a Special Plea in Fraud, as a separate pleading from the previously filed Answer. In support, the Government filed Exhibits A–D. On June 19, 2000, with leave of the court, the Government filed Supplemental Counterclaims and a Special Plea in Fraud. On July 18, 2000, the court granted the Government's Motion to Consolidate Case No. 99–529C and Case No. 99–530C with Case No. 99–279C and ordered all discovery regarding the Government's affirmative defenses and counterclaims to be completed by May 1, 2001.

On January 10, 2001, with leave of the court, MDI filed an Answer to the Government's May 5, 2000 Counterclaim (involving doorframes). On March 9, 2001, the Government filed a Motion to Consolidate Case No. 00–531C with previously consolidated Case No. 99–529C, Case No. 99–530C, and this action, Case No. 99–279C. On April 4, 2001, the court convened a status conference. On May 10, 2001, the Government asked for leave to file (First) Amended Counterclaims. On June 12, 2001, MDI filed a Response. On June 19, 2001, the court entered an Order granting the Government leave to file a Reply to MDI's Response on July 2, 2001. On July 2, 2001, the Government filed a Reply to MDI's Opposition to the Government's Motion for Leave to File Amended Claims, together with Government Exhibits 1–7. On July 20, 2001, the court granted an extension to file interrogatories by August 8, 2001. On July 20, 2001, the Government filed a motion to extend discovery until November 1, 2001 and for the appointment of a "settlement judge." [6] On September 10, 2001, the court extended the discovery deadline to September 14, 2001. On September 27, 2001, the court extended the response time for interrogatories until October 1, 2001. On October 12, 2001, the court entered an Order granting the Government's May 10, 2001 motion to file (First) Amended Counterclaims.[7]

On November 1, 2001, MDI d/b/a ACMI filed a Motion to Dismiss the Government's (First) Amended Counterclaim, which is the subject of this Memorandum Opinion. The following additional procedural history is limited to those pleadings and orders relevant to the court's disposition of the Government's Anti–Kickback Act Counterclaim. Other substantive motions will be adjudicated in separate Memorandum Opinions to follow.

On November 2, 2001, discovery was extended to December 21, 2001. On November 20, 2001, the Government filed a motion for leave to file (Second) Amended Counterclaims. On November 29, 2001, the court entered an Order granting the Government until December 4, 2001 to respond to MDI's November 2, 2001 Motion to Dismiss. On December 7, 2001, the Government filed an Opposition to MDI d/b/a ACMI's November 1, 2001 Motion to Dismiss and Motion For Partial Summary Judgment of the Government's Seventh Counterclaim, together with Exhibits 1–19. In addition, the Government filed Proposed Findings of Uncontroverted Facts on December 7, 2001 to support the Motion for Partial Summary Judgment. On the same day, the court reset the response deadline to January 7, 2002. On December 21, 2001, the parties jointly requested that the court extend discovery to April 1, 2002.

---

5. The Government's pleading was mis-named since no affirmative defenses were asserted, however, five counterclaims were asserted. In addition, the proper cause of action is restitution; unjust enrichment is an element of a claim for restitution not an independent cause of action. *See* RESTATEMENT OF RESTITUTION § 1 (1937) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other."). Accordingly, the Government should file a (Fourth) Amended Counterclaim to correct this pleading error.

6. The docket does not reflect how the Government's request for a "settlement judge" was resolved by Judge Smith.

7. Although the motion was granted by the court on October 12, 2001, the Government's (First) Amended Counterclaims were not docketed by the Clerk until January 11, 2002.

On January 11, 2002, the court entered an Order to extend all discovery until April 1, 2002. In addition, the court issued an Order to consolidate Case No. 00–531C with previously consolidated Case No. 99–529C, Case No. 99–530C and with this action, Case No. 99–279C. In addition, on January 11, 2002, the court granted the Government's November 20, 2001 Motion for Leave to File Amended Counterclaims and the Clerk docketed the Government's (Second) Amended Counterclaims requesting that the court declare the termination for default of the Phase II Contract was "proper."

On February 27, 2002, MDI d/b/a ACMI filed a Reply to the Government's December 7, 2001 Opposition to Plaintiff's Motion to Dismiss the Government's Seventh Counterclaim, together with Genuine Issues and MDI d/b/a ACMI's Proposed Findings of Uncontroverted Facts. On the same date, MDI d/b/a ACMI also filed an Opposition to the Government's December 7, 2001 Motion for Partial Summary Judgment.

On March 18, 2002, MDI d/b/a ACMI filed an Answer to the Government's November 20, 2001 (Second) Amended Counterclaims. On March 19, 2002, the court issued an Order extending discovery to May 31, 2002. On March 28, 2002 and May 22, 2002, the court issued Orders granting the Government's Motions to Extend to Time to Reply to MDI's Motion to Dismiss the Government's Seventh Counterclaim regarding the Anti–Kickback Act.

On June 18, 2002, the court entered an Order extending discovery until July 31, 2002 and extending the time in which MDI d/b/a ACMI would file a Surreply. On July 9, 2002, the Government filed a Reply to MDI d/b/a ACMI's February 27, 2002 Opposition to the Government's December 7, 2001 Motion for Summary Judgment Regarding the Seventh Amended Counterclaim, together with Appendix Exhibits 20–38. On August 2, 2002, the court granted a Motion to Extend discovery until August 30, 2002 with responses to interrogatories due on August 14, 2002. On August 21, 2002, MDI d/b/a ACMI filed a Surreply that addressed in part issues regarding the Anti–Kickback Act, together with Exhibit A. On September 19, 2002, the court held a status conference. On September 20, 2002, the court issued an Order granting an extension of discovery to October 1, 2002.

On October 7, 2002, the Government filed a Surrebuttal and Opposition to MDI's Motion to Dismiss Regarding the Seventh Counterclaim, together with Exhibits 39–50. On October 23, 2002, the Government filed a Motion for Leave to File (Third) Amended Counterclaims. On November 8, 2002, the court granted the Government's Motion for Leave to File (Third) Amended Counterclaims. On November 27, 2002, MDI d/b/a ACMI filed an Amended Answer to the October 23, 2002 Government's (Third) Amended Counterclaims denying the Government's Seventh Counterclaim brought under the Anti–Kickback Act of 1986. On March 4, 2003, the court granted both parties until April 29, 2003 to file other dispositive motions. On May 8, 2003, the Government filed a further Motion for Partial Summary Judgment and Proposed Findings of Uncontroverted Fact.

\* \* \* \* \* \*

On August 15, 2003, Case No. 99–279C, Case No. 99–529C, Case No. 99–530C, and Case No. 00–513C were assigned to the undersigned judge.

On September 5, 2003, MDI d/b/a ACMI filed an Opposition to the Government's May 8, 2003 Motion for Partial Summary Judgment and Response to the Government's Proposed Findings of Uncontroverted Fact, together with an Appendix consisting of three volumes of exhibits. On November 21, 2003, the Government filed an Answer and Counterclaim in Case No. 03–1537C. On December 10, 2003, the court issued a Scheduling Order, among other things setting all pending motions for oral argument on February 20, 2004.

On January 12, 2004, MDI d/b/a ACMI filed an Answer to the Government's November 21, 2003 Counterclaims. On January 23, 2004, the Government filed a Reply Memorandum, together with Appendix Volume 7. On January 23, 2004, the Government also filed a Rebuttal to MDI d/b/a ACMI's Response to the Government's Proposed Find-

ings of Uncontroverted Fact. On February 20, 2004, the court held an oral argument on all pending motions, including those concerning the Government's counterclaims asserting violations of the Anti–Kickback Act.

On March 1, 2004, MDI d/b/a ACMI filed a Supplemental Declaration of James Brogan. On March 11, 2004, the Government filed a Motion for a Protective Order and Motion to Stay Discovery. On March 23, 2004, MDI d/b/a ACMI filed an Opposition thereto. On April 23, 2004, the court convened a telephone status conference and entered an Order on April 28, 2004 that did not grant the Government's Motion to Stay. On August 30, 2004, MDI d/b/a ACMI filed a Supplemental Opposition to the Government's May 8, 2003 Motion for Partial Summary Judgment. On August 31, 2004, the court issued an Order denying 17 miscellaneous non-substantive motions previously filed in Case No. 99–279C with the Honorable Loren A. Smith as now moot. On October 6, 2004, the Government filed a Response to MDI d/b/a ACMI's Supplemental Brief.

\*      \*      \*      \*      \*      \*

On or about September 20, 2004, ACMI filed an action at the General Services Administration Board of Contract Appeals, docketed as GSBCA No. 16503, requesting that the GSA Contracting Officer's failure to act on ACMI's August 27, 2001 certified claim should be deemed a denial, pursuant to 41 U.S.C. § 605(c)(3). *Id.* at 2. As previously discussed, on September 20, 2004, the date of the docketing of GSBCA No. 16503, however, MDI and ACMI were no longer owned by AMEC, p.l.c. On November 24, 2004, the Government filed a Motion to Transfer GSBCA No. 16503 to the United State Court of Federal Claims, pursuant to 41 U.S.C. § 609(d). On December 5, 2005, MDI d/b/a ACMI filed an Opposition to the Government's Motion to Transfer and Consolidate. On April 18, 2005, the Government filed a Supplemental Brief in Opposition. Today, the court also has issued a separate Memorandum Opinion and Order transferring GSBCA No. 16503 to the United States Court of Federal Claims.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (quoting *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States,* 386 F.3d 1091, 1094 (Fed.Cir.2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth v. United States,* 378 F.3d 1371, 1384 (Fed.Cir.2004) ("Because the Tucker Act itself does not provide a substantive cause of action, ... a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

For jurisdictional purposes, a statute or regulation is money-mandating if it "can fairly be interpreted as mandating compensation by the Federal Government for damages" *United States v. Mitchell,* 463 U.S. 206, 217–19, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). In *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003), the United States Supreme Court explained that:

    [t]his "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity .... It is enough, then, that a statute creating a Tucker Act right be

reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," ... a *fair inference* will do.

*Id.* at 472–73, 123 S.Ct. 1126 (emphasis added); *see also Fisher v. United States,* 402 F.3d 1167, 1173 (Fed.Cir.2005) ("[In a single step] the trial court determines both the question of whether the statute provides the predicate for its jurisdiction, and lays to rest for purposes of the case before it the question of whether the statute on its merits provides a money-mandating remedy.").

Although the Tucker Act expressly prohibits the United States Court of Federal Claims from exercising jurisdiction over cases "sounding in tort," the United States Court of Appeals for the Federal Circuit has held that "where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and thus is properly within the exclusive jurisdiction of the [United States] Court of Federal Claims[.]" *Awad v. United States,* 301 F.3d 1367, 1372 (Fed.Cir.2002); *see also Wood v. United States,* 961 F.2d 195, 198 (Fed.Cir. 1992) (quoting *San Carlos Irrigation and Drainage Dist. v. United States,* 877 F.2d 957, 960 (Fed.Cir.1989)) ("If an action arises 'primarily from a contractual undertaking,' jurisdiction lies in the [United States] Claims Court 'regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract.' ").

The United States Court of Federal Claims also has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under ... the Contract Disputes Act of 1978 [42 U.S.C. § 609(a)], including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *see Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1270 (Fed.Cir.1999) (holding that "the Tucker Act grants the United States Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor

claims, including claims requesting an interpretation of contract terms.").

In this case, the Complaint properly alleges the court's jurisdiction under 28 U.S.C. § 1491 and 42 U.S.C. § 609(a). *See* Compl. ¶ 3 at 2. The Government's May 10, 2001 (First) Amended Counterclaim and subsequent Amended Counterclaims also properly invoke the court's jurisdiction to adjudicate claims under the Anti–Kickback Act. *See* 41 U.S.C. § 609(a); *see also* (First) Am. Counterclaims ¶ 3 at 2; *see also id.* ¶¶ 145–48 at 37–38.

## B. Standing.

MDI d/b/a ACMI and the Government, as parties to Contract No. GS06P94GYC0037, Contract No. GS06P95GZC0501, Contract No. GS09P95KTC0010, and Contract No. GS09P95KTC0032, have standing to bring an action or counterclaim in the United States Court of Federal Claims, pursuant to the Tucker Act, 28 U.S.C. § 1491 and the Contract Disputes Act, 41 U.S.C. § 609(a).

## C. Standard Of Review.

### 1. Motion To Dismiss–RCFC 12(b)(6).

In ruling on a motion to dismiss, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States,* 60 F.3d 795, 797 (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001) (citations omitted) ("When reviewing a dismissal for failure to state a claim upon which relief can be granted under ... Rule 12(b)(6) ... [the court] must accept as true all the factual allegations in the complaint, and ... indulge all reasonable inferences in favor of the non-movant."). Dismissal for failure to state a claim under Rule 12(b)(6) "is proper only when a plaintiff can 'prove no set of facts in support of his claim which would entitle him to relief.' " *Adams v. United States,* 391 F.3d 1212, 1218 (Fed. Cir.2004) (quoting *Leider v. United States,* 301 F.3d 1290, 1295 (Fed.Cir.2002)); *see also* RCFC 12(b)(6).

### 2. Motion For Partial Summary Judgment–RCFC 56(c).

If there is no genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *See Winstar Corp. v. United States,* 64 F.3d 1531, 1539 (Fed.Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see also* RCFC 56(c). A material fact is one that might significantly affect the outcome of the suit under applicable law. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of *"some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Where the non-moving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party carries its burden to demonstrate an absence of any genuine issue of material fact, then the burden of proof shifts to the non-moving party to show a genuine factual dispute exists. *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the non-moving party. *Id.* at 1562–63. The court is required to resolve any doubts about factual issues in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In doing so, all presumptions and inferences drawn from the evidence must be resolved in favor of the non-moving party. *Id.; see also Jay v. Sec'y of Dept. of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.1993).

### D. Anti–Kickback Act Of 1986.

The Anti–Kickback Act defines a "kickback" as:

> any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract.

41 U.S.C. § 52(2).

The Anti–Kickback Act states that "[i]t is prohibited for any person:

> (1) to provide, attempt to provide, or offer to provide any kickback;
>
> (2) to solicit, accept, or attempt to accept any kickback; or
>
> (3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States."

*Id.* § 53.

In addition, the United States in a civil action may:

> recover a civil penalty from any person who knowingly engages in conduct prohibited by section 53 of this title. The amount of such civil penalty shall be-
>
> > (A) twice the amount of each kickback involved in the violation; and
> >
> > (B) not more than $10,000 for each occurrence of prohibited conduct.
>
> (2) The United States may, in a civil action, recover a civil penalty from any person whose employee, subcontractor or subcontractor employee violates section 53 of this title by providing, accepting, or charg-

ing a kickback. The amount of such civil penalty shall be the amount of that kickback.

*Id.* § 55(a)(1)-(a)(2).

### E. Summary Of The Parties's Arguments.

#### 1. MDI's Argument.

On November 1, 2001, MDI d/b/a ACMI filed a Motion to Dismiss the Seventh Counterclaim of the Government's (First) Amended Counterclaims arguing that the "commission splitting" arrangements between AMEC, p.l.c., the parent of MDI d/b/a ACMI, and the surety brokers, Willis Carroon and/or RHH/AON, were a discount, promotional allowance or rebate that was provided with full knowledge of the parent and subsidiary. *See* Pl. Mem. at 1. MDI d/b/a ACMI asserts that since such "price concessions" are transparent and do not "secretly engender improper influence," they are not "kickbacks" within the scope of the Anti–Kickback Act. *Id.* at 1–2. Moreover, AMEC, p.l.c., the recipient of funds under the arrangement, was not a "prime contractor" or other proscribed payer to which the Anti–Kickback Act applies. *Id.* at 6. The Government's Seventh Counterclaim alleges that the "commission-splitting arrangements, described in [the (First) Amended Counterclaims] Paragraphs 115 through 119, were established 'for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract,' 41 U.S.C. § 52(2), and thus constituted illegal kickbacks in violation of 41 U.S.C. § 53 and in violation of MDI's contracts with GSA." Gov't (Second) Am. Counterclaims § 122 at 39.

#### 2. The Government's Argument.

The Government responded to MDI d/b/a ACMI's Motion to Dismiss on December 7, 2001 by filing a combined Opposition and Motion for Partial Summary Judgment for Liability regarding the Seventh Amended Counterclaim that MDI violated the Anti–Kickback Act, the False Claims Act, 31 U.S.C. § 3729(a)(1) and (First) Amended Counterclaim alleging a breach of contract. *See* Gov't Opp. and S.J. at 1.[8] The Government's argument tracked the three elements of proof of the Anti–Kickback Act, as set forth below. *See* Gov't Opp. and S.J. at 8–15.

### F. The Court's Disposition Of MDI d/b/a ACMI's Motion To Dismiss And The Government's Motion For Partial Summary Judgment Regarding Counterclaim Seven Asserting Violations Of The Anti–Kickback Act Of 1986.

#### 1. AMEC, p.l.c. And MDI d/b/a ACMI Are "Prime Contractors."

■ A threshold issue is whether AMEC, p.l.c. is a "prime contractor" or "prime contractor employee" under the Anti–Kickback Act. The Act defines "prime contractor" as a "person who has entered into a prime contract with the United States." 41 U.S.C. § 52(5). A "person" is defined as a "corporation, partnership, business association of any kind, trust, joint-stock company, or individual." 41 U.S.C. § 52(3). Since AMEC, p.l.c. was a 50% owner of MDI when MDI was a prime contractor on Phase I of the St. Louis Courthouse project, the court has determined, as a matter of law, that AMEC, p.l.c. was a "prime contractor," subject to the Anti–Kickback Act, and in that capacity AMEC, p.l.c. received fee commission payments. *Id., see also* H.R. REP. No. 99–964, at 12 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5960, 5969. Whether AMEC, p.l.c. was a "proscribed payee," as MDI d/b/a ACMI argues, is irrelevant. Likewise, there is no material fact at issue as to whether MDI d/b/a ACMI is a "prime contractor" under the Anti–Kickback Act.

#### 2. The Purpose Of The Fee Commission Splitting Arrangement Was "For The Purpose Of Improperly Obtaining Or Rewarding Favorable Treatment."

■ The record clearly established that the purpose of the fee commission splitting

---

**8.** The Government's December 7, 2001 Motion for Partial Summary Judgment also alleged other violations of law that the court has not discussed nor ruled on herein, but will be considered and determined in subsequent Memorandum Opinion(s) and Order(s) to be issued once the transfer of interest and potential joinder issues are resolved to the court's satisfaction.

arrangement was to "cement" Willis Carroon's and RHH/AON's business relationship with AMEC, p.l.c. and MDI for all purposes. *See, e.g.,* Gov't PF 14, 16, 17; Gov't Opp. Ex. 2 (Bardsley Dep. at 86), Gov't Opp. Ex. 5 (Romano Dep. at 79, 89–90); *see also* Gov't Opp. and S.J. at 13 ("[T]he bond brokers sought to use commissions they received for providing bonds to Morse Diesel, including the bonds for the four GSA contracts, to induce Morse Diesel and its parent company to continue and even expand their business dealings with the brokers. The split commissions were a gratuity designed to induce favorable treatment and line the brokers' pockets down the road[.]"). The record is also clear that AMEC, p.l.c. received substantial financial benefits from the split-fee commissions received by Willis Carroon and RHH/AON. *Id.*

In *United States v. Acme Process Equipment Company,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1967), the United States Supreme Court explained why kickbacks under the Anti–Kickback Act of 1946, 60 Stat. 37, as amended, 74 Stat. 740, a predecessor to the Anti–Kickback Act, 41 U.S.C. § 51, were "prohibited payments" detrimental to the federal procurement process:

> Extra expenditures to get subcontracts necessarily add to government costs in ... a negotiated fixed-price contract with a price redetermination clause .... The kickbacks here are passed on to the Government in two stages. The prime contractor rarely submits his bid until after he has tentatively lined up his subcontractors.... The subcontractor's tentative bid will, of course, reflect the amount he contemplates paying as a kickback, and then his inflated bid will be reflected in the prime contractor's bid to the Government. At the renegotiation stage, where the prime contractor's actual cost experience is the basis for price redetermination, any kickbacks, paid by subcontractors and passed on to the prime contractor after the prime contract is awarded, will be passed on to the Government in the form of price redetermination upward.

*Id.* at 143, 87 S.Ct. 350.

\*　　\*　　\*　　\*　　\*　　\*

> [E]ven if the Government could isolate and recover the inflation attributable to the kickback, it would still be saddled with a subcontractor who, having obtained the job other than on merit, is perhaps entirely unreliable in other ways. This unreliability in turn undermines the security of the prime contractor's performance—a result which the public cannot tolerate[.]

*Id.* at 144–45, 87 S.Ct. 350.

Congress built on the *Acme Process malum prohibitium* characterization of economic harm caused by kickbacks, by utilizing specific language in the Anti–Kickback Act to create a presumption that any kickback was included in the price of an affected federal contract or subcontract and therefore increased costs to the Government. *See* 41 U.S.C. § 53; *see also* H.R. REP. No. 99–964, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5960, 5964 ("The statute applie[d] a conclusive presumption that when a kickback payment has occurred, 'the cost of such expense was included in the price of the subcontract ... and ultimately borne by the United States.'").

For the same reasons, Congress intended the language "favorable treatment" be construed broadly to reach all conduct analogous to commercial bribery. *See* H.R. REP. No. 99–964, at 12, (1986), *reprinted in* 1986 U.S.C.C.A.N. 5960, 5969. Accordingly, it has been recognized that the scope of the Anti–Kickback Act extends to conduct akin to commercial bribery, even if it did "not directly [impact] the federal treasury." *United States v. Purdy,* 144 F.3d 241, 244 (2d Cir.), *cert denied,* 525 U.S. 1020, 119 S.Ct. 548, 142 L.Ed.2d 455 (1998). Of course, payments specifically authorized by a contract or behavior that would be commonly recognized as incidental business accommodations are excluded.

In this case, whether or not all the participants of the fee commission splitting arrangement had knowledge of the circumstances or illegality of their conduct, as a matter of law, is irrelevant. *Id.* at 245 ("[K]ickbacks made at any point in the government procurement process for the purpose of improperly obtaining favorable treat-

ment are prohibited by the Act, regardless of whether or not the offender knew of the government involvement."). Likewise, MDI d/b/a ACMI's argument that the fee commission splitting arrangement was analogous to benign promotional allowances, rebates, or discounts are wholly unpersuasive. *See* Pl. Mot. to Dismiss at 5. The ultimate customer for the bond services was the Government, which had no knowledge of the kickback scheme and received no financial benefit from Willis Carroon and RHH/AON's financial largess. In fact, but for MDI d/b/a ACMI's contracts with the Government, Willis Carroon, RHH/AON and AMEC, p.l.c. would have earned no brokerage fees on that work, and any financial accommodations made to obtain that work should have been accomplished by submitting the lowest possible price for MDI d/b/a ACMI's services. Instead, a higher price for bond services was included in the fixed contract price that MDI d/b/a ACMI was awarded. There are no material issues of fact in dispute, nor can there be in light of Congress' presumption that a kickback was passed on to the Government. *See* 41 U.S.C. § 53; *see also Acme Process,* 385 U.S. at 143, 87 S.Ct. 350. MDI d/b/a ACMI also received the additional financial benefit of the split fee commissions. Therefore, the court has determined, as a matter of law, that the fee commission splitting arrangement was "for the purpose of improperly obtaining or rewarding favorable treatment."

### 3. The St. Louis Courthouse Phase I And Phase II, Sacramento Courthouse, And San Francisco GSA Contracts Were "Prime Contracts."

The Anti–Kickback Act defines "prime contract" as "a contract ... entered into by the United States for the purposes of obtaining ... services of any kind." 41 U.S.C. § 52(4). There can be no material issue of factual dispute that Contract No. GS06P94GYC0037, Contract No. GS06P95GZC0501, Contract No. GS09P95KTC0010, and Contract No. GS09P95KTC0032 are "prime contracts." *See, e.g.,* HR Rep. No. 99–964, at 12 (1986) *reprinted in* 1986 U.S.C.C.A.N. 5960–61

("The term 'prime contract' is intended to be construed broadly.").

### CONCLUSION

For these reasons, MDI's November 1, 2001 Motion to Dismiss the Seventh Counterclaim of the Government's May 10, 2001, November 20, 2001, October 23, 2002, and November 21, 2003 Amended Counterclaims is denied and the Government's December 7, 2001 Motion for Partial Summary Judgement Regarding the Seventh Counterclaim asserting a violation of the Anti–Kickback Act in the aforementioned Counterclaims is granted. The court will enter an order regarding the legal determinations discussed in this Memorandum Opinion and the amount of civil penalties and other appropriate relief to which the Government may be entitled will be determined at a later date.

In addition, the court will convene a conference with counsel for the parties during the week of July 25, 2005 to discuss the party at interest and joinder issues raised in this Memorandum Opinion. That conference will be held at the United States Court of Federal Claims located at 717 Madison Place, N.W., Washington, D.C., 20005.

**IT IS SO ORDERED.**