UNITED STATES *v.* ACME PROCESS
EQUIPMENT CO.

No. 86.   Argued November 9, 1966.—Decided December 5, 1966.

*Solicitor General Marshall* argued the cause for the United States.   With him on the brief were *Assistant Attorney General Douglas, Richard A. Posner, David L. Rose* and *Robert V. Zener.*

*Jack Rephan* argued the cause for respondent.   With him on the brief were *Raymond R. Dickey* and *Bernard Gordon.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The respondent, Acme Process Equipment Company, brought this action against the United States in the Court of Claims to recover damages for breach of a contract under which Acme undertook through itself and subcontractors to manufacture 2,751 75-mm. recoilless rifles for about $337 per rifle.   Among other defenses, the United States alleged that it had rightfully canceled its contract with Acme because three of Acme's principal employees had accepted compensation for awarding subcontracts in violation of the Anti-Kickback Act set out

in part below.[1]   The Court of Claims found, as facts, that the kickbacks had been paid as alleged and that this was the ground on which the United States had canceled the prime contract with Acme, but construed the Act as not authorizing the cancellation.   171 Ct. Cl. 324, 347 F. 2d 509.   We hold that it does.

## I.

In October 1952, Acme hired Harry Tucker, Jr., and his associate, James Norris, for the purpose of establishing and managing a new division of the company to handle government contracts.   Norris was made general manager of production with authority to submit bids, sign government contracts, and award subcontracts. Tucker was placed in charge of sales, government con-

---

[1] Section 1 of the Anti-Kickback Act, 60 Stat. 37, as amended, 74 Stat. 740, 41 U. S. C. § 51, provides in pertinent part:

"That the payment of any fee, commission, or compensation of any kind or the granting of any gift or gratuity of any kind, either directly or indirectly, by or on behalf of a subcontractor, . . . (1) to any officer, partner, employee, or agent of a prime contractor holding a negotiated contract entered into by any department, agency, or establishment of the United States for the furnishing of supplies, materials, equipment or services of any kind whatsoever . . . as an inducement for the award of a subcontract or order from the prime contractor . . . is hereby prohibited.   The amount of any such fee, commission, or compensation or the cost or expense of any such gratuity or gift, whether heretofore or hereafter paid or incurred by the subcontractor, shall not be charged, either directly or indirectly, as a part of the contract price charged by the subcontractor to the prime contractor . . . .   The amount of any such fee, cost, or expense shall be recoverable on behalf of the United States from the subcontractor or the recipient thereof by setoff . . . or by an action in an appropriate court of the United States. . . ."

Section 4 of the Act, 41 U. S. C. § 54, provides:

"Any person who shall knowingly, directly or indirectly, make or receive any such prohibited payment shall be fined not more than $10,000 or be imprisoned for not more than two years, or both."

tracts, and expediting subcontract operations. Prior to this time Tucker had entered into a contract with All Metals Industries, Inc., under which he was to receive a commission for all sales to customers, including Acme, procured by him. Tucker's employment contract with Acme specifically stated that he represented and would continue to represent firms in other lines of business, but Acme did not consult with any of his other clients at the time Tucker was hired.

Late in October, Tucker advised his superiors at Acme of the proposed Army contract for rifles, and at Tucker's suggestion, Acme submitted a bid of $337 per rifle. Since Acme's bid was the lowest, the Army began negotiations with Acme culminating in the award of the contract in January 1953. The negotiations were handled by Tucker and Norris for Acme. Since it was contemplated that the project would be largely subcontracted, leaving to Acme only the final finishing and assembly of components, the Army expressed a keen interest in Acme's proposed subcontractors. Not only did it review Acme's subcontracting plans and require Acme to notify it of changes in those plans during the final stages of negotiation, but the contract eventually awarded required government approval of all subcontracts in excess of $25,000. All Metals, because its proposed subcontract amounted to one-third of the amount of the prime contract, actually participated in the negotiations between Acme and the Army.

During this period of negotiation two other developments took place. Tucker obtained agreements from two other potential subcontractors to pay him commissions on any orders he could procure from Acme. Army contracting officers warned Acme's president, Joshua Epstein, that Tucker was suspected of having engaged in contingent-fee arrangements with other government contractors.

Finally, Acme was awarded the prime contract. Although the price was fixed at $337 per rifle, the contract contained a price redetermination clause under which, after 30% of the rifles were delivered, the parties could negotiate the price on past and future shipments upward or downward, with an upper limit of $385 per rifle. Within a few weeks after the prime contract was awarded, All Metals and the other two companies with which Tucker had prior kickback arrangements obtained subcontracts from Acme.[2] Tucker was paid his kickbacks, but, apparently unsatisfied with the amount of his payoff, he got Jack Epstein, the superintendent of the chief Acme plant and the son of Acme's president and principal stockholder, to join the kickback conspiracy. Together Epstein and Tucker threatened to cancel All Metals' subcontract unless it paid $25,000 to a dummy corporation owned by Tucker, Norris, and Epstein for fictitious consulting services. All Metals reluctantly acceded to the shakedown. The amount paid to Tucker, Norris, and Epstein was charged to Acme through an increase in the subcontract price.

Although they knew that Tucker was representing other companies and had been notified of the Army's suspicions of Tucker's involvement in contingent-fee arrangements, other officials of Acme were not aware of the kickback activities of Tucker, Norris, and Epstein until late in 1953. At that time, Acme's president caused the resignation of the three suspected officials.

In 1956 Tucker, Norris, and Epstein were indicted for violation of the then Anti-Kickback Act, 60 Stat. 37.[3]

---

[2] Shortly after the prime contract was awarded, two other companies paid Tucker's father and Norris' assistant kickbacks for obtaining subcontracts from Acme. This made a total of five subcontracts obtained through kickbacks.

[3] This was the original Anti-Kickback Act passed by Congress in 1946. It expressly prohibited kickbacks only to employees of "a

After presentation of the Government's case, the District Court granted the defendants' motion for acquittal on the ground that the Act—which at that time embraced only "cost-plus-a-fixed-fee or other cost reimbursable" government contracts—did not apply to Acme's contract, a fixed-price contract with a provision for limited price redetermination. The court found the defendants' actions "despicable and morally reprehensible, but unfortunately within the narrow letter of the law." The court recommended that Congress amend the Anti-Kickback Act "to include as a crime the vicious and immoral type of conduct that has been exhibited in this case." *United States* v. *Norris,* Crim. No. 18535 (D. C. E. D. Pa.), April 14, 1956.

The District Court's opinion did indeed spur the Comptroller General to recommend amendatory legislation and in 1960 the Anti-Kickback Act was amended to apply to all "negotiated contracts." [4] The civil provision of the amended Act was made retroactive to allow government recovery of kickbacks "whether heretofore or hereafter paid or incurred by the subcontractor."

## II.

The Anti-Kickback Act, as originally passed in 1946 and as amended in 1960, provides two express sanctions for its violation: (1) fine or imprisonment for one who makes or receives a kickback, and (2) recovery of the kickback by the United States. The Court of Claims held, and it is argued here, that had Congress wanted "to provide the additional remedy of contract annulment, it could have done so" by express language, 171 Ct. Cl., at 343, 347 F. 2d, at 521, and of course it could

---

prime contractor holding a contract . . . on a cost-plus-a-fixed-fee or other cost reimbursable basis . . . ."

[4] See generally H. R. Rep. No. 1880, S. Rep. No. 1585, 86th Cong., 2d Sess. The Act, as amended, is set out in part in note 1, *supra.*

have.  But the fact that it did not see fit to provide for such a remedy by express language does not end the matter.  The Anti-Kickback Act not only "prohibited" such payments, but clearly expressed a policy decidedly hostile to them.  They were recognized as devices hurtful to the Government's procurement practices.  Extra expenditures to get subcontracts necessarily add to government costs in cost-plus-a-fixed-fee and other cost reimbursable contracts.  And this is also true where the prime contract is a negotiated fixed-price contract with a price redetermination clause, such as this prime contract is here.  The kickbacks here are passed on to the Government in two stages.  The prime contractor rarely submits his bid until after he has tentatively lined up his subcontractors.  Indeed, as here, the subcontractors frequently participate in negotiation of the prime contract.  The subcontractor's tentative bid will, of course, reflect the amount he contemplates paying as a kickback, and then his inflated bid will be reflected in the prime contractor's bid to the Government.  At the renegotiation stage, where the prime contractor's actual cost experience is the basis for price redetermination, any kickbacks, paid by subcontractors and passed on to the prime contractor after the prime contract is awarded, will be passed on to the Government in the form of price redetermination upward.[5]

----

[5] This is precisely what happened here before the Government canceled Acme's contract.  Acme in 1953 submitted cost data for price redetermination purposes that included the charges of the five subcontractors which had paid kickbacks to Acme's employees.  These subcontracting charges in turn included the amounts paid as kickbacks.  Had the kickbacks not been discovered and the contract not been canceled, Acme would have been able to use these costs to renegotiate the price per rifle from $337 to $385.  Such price redetermination could have cost the Government about $132,000 more on the entire contract.

Acme argues, however, that the express provision for recovery of kickbacks is enough to protect the Government from increased costs attributable to them. But this argument rests on two false assumptions. The first is that kickbacks can easily be detected and recovered. This is hardly the case. Kickbacks being made criminal means that they must be made—if at all—in secrecy. Though they necessarily inflate the price to the Government, this inflation is rarely detectable. This is particularly true as regards defense contracts where the products involved are not usually found on the commercial market and where there may not be effective competition. Such contracts are generally negotiated and awarded without formal advertising and competitive bidding, and there is often no opportunity to compare going prices with the price negotiated by the Government.[6] Kickbacks will usually not be discovered, if at all, until after the prime contract is let. The second false assumption underlying Acme's argument is that the increased cost to the Government is necessarily equal to the amount of the kickback which is recoverable. Of course, a subcontractor who must pay a kickback is likely to include the amount of the kickback in his contract price. But this is not all. A subcontractor who anticipates obtaining a subcontract by virtue of a kickback has little incentive to stint on his cost estimates. Since he plans to obtain the subcontract without regard to the economic merits of his proposal, he will be tempted to inflate that proposal by more than the amount of the kickback. And even if the Government could isolate and recover the inflation attributable to the kickback, it would still be saddled with a subcontractor who, having obtained the job other than on merit, is perhaps entirely unreliable in other ways. This unreliability in

---

[6] See S. Rep. No. 1585, *supra*, n. 4, at 3.

turn undermines the security of the prime contractor's performance—a result which the public cannot tolerate, especially where, as here, important defense contracts are involved.

### III.

In *United States* v. *Mississippi Valley Co.*, 364 U. S. 520, 563, the Court recognized that "a statute frequently implies that a contract is not to be enforced when it arises out of circumstances that would lead enforcement to offend the essential purpose of the enactment." The Court there approved the cancellation of a government contract for violation of the conflict-of-interest statute on the ground that "the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in" the statute. *Ibid.* We think the same thing can be said about cancellation here.

The Court of Claims, in holding that the Anti-Kickback Act does not authorize government cancellation because of its violation, distinguished *Mississippi Valley Co.* on the ground that the Anti-Kickback Act, unlike the conflict-of-interest statute, provides a civil as well as a criminal remedy. But we do not deem the provision of a civil remedy in the Anti-Kickback Act decisive. Where there is a mere conflict of interest, no concrete monetary rewards may have been received or paid which the Government can recover in a civil action. But where there is commercial bribery in the form of a kickback, there is something specific which the Government can recover, and hence it was quite natural for Congress to provide this express remedy. There is absolutely no indication in the legislative history of the Anti-Kickback Act that Congress, in providing a civil remedy for a more tangible evil, intended to preclude other civil sanctions necessary to effectuate the purpose of the Act.

There is likewise no merit to the Court of Claims' distinction of the *Mississippi Valley Co.* case on the ground that there the criminal provision of the conflict-of-interest statute was violated whereas here the kickback conspirators were acquitted of violating the Anti-Kickback Act as it existed when the kickbacks occurred, prior to 1960. As we have seen, Acme's employees were acquitted on the technical ground that Acme's prime contract was not a "cost reimbursable" contract to which the Act then expressly applied. It is unnecessary for us to decide whether this holding was correct.[7] For whether the kickbacks here contravened the narrow letter of the criminal law, strictly construed, they clearly were violative of the public policy against kickbacks first expressed by Congress in 1946. If Congress then limited the reach of the Act to cost reimbursable contracts, it was only because other types of negotiated contracts were rarely in use then. Though the recent extensive use of other forms of negotiated contracts led Congress in 1960 to amend the Act to cover clearly these types of contracts and to close the technical loophole opened by the acquittal of Acme's employees, the congressional policy against *all* kickbacks was not changed. Congress merely reiterated its recognition of the evil and sought to correct the letter of the law to effectuate its long-standing policy. In making the civil remedy of the 1960 Act retroactive, Congress clearly indicated that there had been no basic change in the public policy against kickbacks.

This public policy requires that the United States be able to rid itself of a prime contract tainted by kickbacks.

---

[7] See *United States* v. *Barnard*, 255 F. 2d 583, cert. denied, 358 U. S. 919, holding that a fixed-price contract with provision for unlimited price redetermination is a "cost reimbursable" contract.

Though the kickbacks did not take place until after the prime contract was awarded to Acme, the kickback arrangements existed either at the time the prime contract was awarded or shortly thereafter, and at least one of the kickbacking subcontractors actually participated in the negotiation of the prime contract. These circumstances, as well as the price redetermination feature of the prime contract, produced a great likelihood that the cost of the prime contract to the Government and the reliability of Acme's performance under it would be directly affected by the fact that the prime contract was to be performed largely through subcontracts obtained by kickbacks.

The Court of Claims, in holding that the Act does not authorize government cancellation because of kickbacks, relied heavily on its finding that none of the officers of Acme were aware of the kickbacks. But as previously stated those of Acme's employees and agents who did know were in the upper echelon of its managers. One of the guilty employees was the general manager of one of the company's chief plants and the son of Acme's president, and the two other kickback receivers were in charge of operations, sales, and government contracts. They were the kind of company personnel for whose conduct a corporation is generally held responsible. Cf. *Gleason* v. *Seaboard Air Line R. Co.*, 278 U. S. 349. Since Acme selected those agents to carry on its business in obtaining and performing government contracts, there is no obvious reason why their conduct in that field should not be considered as Acme's conduct, particularly where it touches the all-important subject of kickbacks. And here, as this Court said about the conflict-of-interest statute in *United States* v. *Mississippi Valley Co., supra,* at 565, it is appropriate to say that it is the "inherent difficulty in detecting corruption which requires that

contracts made in violation of . . . [the Anti-Kickback Act] be held unenforceable, even though the party seeking enforcement ostensibly appears entirely innocent."

The judgment of the Court of Claims is reversed with directions to sustain the United States' right to cancel the prime contract.

*It is so ordered.*