826 F.2d 615
 EASTERN ILLINOIS TRUST & SAVINGS BANK, a State Bank
Chartered Under the Laws of the State of Illinois,
Plaintiff-Counter-Defendant-Appellee,
v.
James C. SANDERS, Administrator of the Small Business
Administration, et al., Defendants-Appellants,
and
United States of America, Counter-Plaintiff-Appellant.
 No. 86-2403.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 26, 1987.
Decided Aug. 11, 1987.
 
 Linda A. Wawzenski, Asst. U.S. Atty., Anton Valukas, U.S. Atty., U.S. Attorney's Office, Chicago, Ill., for appellants.
 Jeffrey D. Colman, Norman M. Hirsch, Jenner & Block, Chicago, Ill., for appellee.
 Before CUDAHY, RIPPLE and MANION, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 Eastern Illinois Trust & Savings Bank ("Eastern") sued the Small Business Administration (the "SBA") for damages based on the SBA's refusal to abide by its agreement to purchase from Eastern 90% of three SBA-guaranteed loans that had lapsed into default. The SBA responded that Eastern had violated their agreement, thus releasing the SBA from its guaranty obligations; the SBA also counterclaimed for the amount it had paid to purchase one defaulted loan. After a bench trial the district court concluded that Eastern's actions did not materially breach the guaranty agreement and that, therefore, the SBA was required to honor its guarantees of the three loans. The SBA appeals. We affirm.
 
 I.
 
 2
 The SBA operates a guaranteed loan program that assists small businesses in obtaining financing on reasonable terms when money is unavailable from other sources. See 15 U.S.C. Sec. 631 et seq. Participating banks normally enter into a guaranty agreement with the SBA, setting out procedures and requirements for the guaranteed loan program. When a qualified borrower applies to a bank for an SBA-guaranteed loan, the bank must obtain authorization from the SBA to proceed with the loan. After SBA approval, the bank lends its own funds to the borrower and services the loan pursuant to the guaranty agreement. If the borrower defaults, the bank may demand that the SBA purchase its share of the outstanding balance--typically, and in this case, 90% of the balance.
 
 
 3
 In 1978 Eastern and the SBA entered into a standard guaranty agreement. This agreement prescribed terms and conditions of SBA-guaranteed loans and incorporated by reference all applicable rules and regulations of the SBA. One standard condition imposed by SBA regulations is a cap on the interest rate that a participating bank may charge for a guaranteed loan. 13 C.F.R. Sec. 122.8. Another condition permits the SBA to refuse to purchase its share of a guaranteed loan in cases where a participating bank has not "substantially complied" with SBA requirements. 13 C.F.R. Sec. 120.202-5.
 
 
 4
 The guaranty agreement itself, executed by Eastern and the SBA and incorporated in each of the four loans at issue here, prohibited Eastern from charging any fees or commissions in connection with a loan, unless paid for actual services rendered.[1] SBA regulations require that any such fee or commission accepted as payment for services rendered must be disclosed to the SBA. See C.F.R. Secs. 120.104, 120.303. These provisions presumably operate to prohibit a participating bank from evading ceilings on interest rates by charging points or making side loans to borrowers.
 
 
 5
 In each of the four loans at issue here, however, Eastern made a secondary loan to the borrower, not disclosed to the SBA, that resulted in interest payments higher than those prescribed by the guaranty agreement. See mem. op. 631 F.Supp. 1393, 1394-95 (N.D.Ill.1986). It is undisputed that these side loans violated terms of the guaranty agreement. The crux of this case is the question whether Eastern's conduct in connection with the four loans nonetheless constituted substantial compliance with SBA requirements such that the SBA must honor its guaranty obligations.
 
 
 6
 Eastern sought $880,363.00 plus interest, costs and attorney's fees, after the SBA refused to purchase its usual share of these defaulted loans. The SBA sought a return of the $364,468.25 it earlier paid to purchase one guaranteed loan before learning of Eastern's prohibited side loans.
 
 II.
 
 7
 Eastern violated the terms of its guaranty agreement with the SBA. The question whether the violation was a material breach of the agreement, or rather whether Eastern substantially complied with the agreement, is a question of general federal law. See United States v. Kimbell Foods, Inc., 440 U.S. 715, 726-27, 99 S.Ct. 1448, 1457-58, 59 L.Ed.2d 711 (1979); First Nat'l Bank v. Small Business Admin., 429 F.2d 280, 286-87 (5th Cir.1970); cf. Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943) ("[A]pplication of state law ... would subject the rights and duties of the United States to exceptional uncertainty.... [leading] to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states."). The question whether or not a particular breach of a contract is "material" is a question of fact requiring detailed attention to all of the circumstances. See, e.g., Sahadi v. Continental Illinois Nat'l Bank & Trust Co., 706 F.2d 193, 196 (7th Cir.1983); Restatement (Second) of Contracts Sec. 241. Assuming that the trial court applied the appropriate legal standards, we review its findings of fact under the clearly erroneous standard. Fed.R.Civ.P. 52(a).
 
 
 8
 We believe that the district court did apply appropriate legal standards in this case. As noted, the materiality of a breach invokes an all-the-circumstances test, and several specific factors have been recognized as relevant to this analysis. The district court cited Sahadi and the factors listed there, but also noted that, since the SBA, a government agency, was a party, special attention must be paid to potential non-financial damage that might flow from a breach. The district court cited four issues affecting materiality:
 
 
 9
 (1) Whether the breach operated to defeat the bargained-for objective of the parties; (2) whether the breach caused disproportionate prejudice to the non-breaching party; (3) whether custom and usage considers such a breach to be material; and (4) whether the allowance of reciprocal non-performance will result in the accrual of an unreasonable and unfair advantage.
 
 
 10
 Mem. op. at 1396. The court also explicitly recognized the special attention to be given to the status of the SBA:
 
 
 11
 A single breach of trust [by Eastern] may have little or no financial impact on the SBA but [may] so undercut the regulatory objectives of a program that the damage caused by the breach is far out of proportion to the damage generally contemplated as the potential risk of a single financial transaction. In the materiality analysis applicable to this case, therefore, the concept of non-financial harm to the SBA must play a role.
 
 
 12
 Id.
 
 
 13
 The court found as a fact that Eastern's breaches neither restricted the flow of funds to borrowers nor limited in any way the borrowers' abilities to repay the principal loans. We do not find this conclusion to be clearly erroneous.[2] Thus the general objective of SBA's program, to assist small businesses in obtaining otherwise unavailable financing, see 15 U.S.C. Sec. 631, does not seem prejudiced by Eastern's actions.
 
 
 14
 In addition, we cannot disagree with the district court's conclusion that the SBA itself suffered no financial prejudice as a result of Eastern's breaches. See mem. op. at 8. The side loans did not affect payments on the primary loans; essentially they increased Eastern's exposure to the borrowers. Eastern's security interests based on the side loans were always junior to the SBA's. Sufficient evidence was introduced to permit the court to conclude as it did that Eastern, in good faith, thought the loans were sound and expected them to be repaid.
 
 
 15
 The SBA contends that it will suffer prejudice, albeit non-financial, if it must carry out the contract despite Eastern's flagrant violations of the requirements of the SBA program. The district court recognized the weight of these concerns, but noted that generally the SBA does not repudiate loan guarantees as a way of deterring future lenders from similar breaches. In fact, the SBA's internal procedural standards themselves outlined two prerequisites to repudiating a guaranty: a substantial failure of compliance and a resulting substantial loss on the loan. See mem. op. at 1396 (referring to SBA standard operating procedure 50-50-3 p 56). The district court also found that in the past the SBA never repudiated a guaranty in circumstances where the SBA suffered no monetary loss caused by the breach or where the lender corrected the breach at the SBA's request. The court concluded that permitting the SBA to repudiate the loans in these circumstances would result in an unreasonable advantage to the SBA, by excusing it from a liability it would have incurred regardless of Eastern's breach. See mem. op. at 1396-98.
 
 
 16
 We have noted the district court's findings at some length principally to indicate that its determination that Eastern's breach was not material derived from a detailed consideration of the several relevant factors. As factual conclusions, these findings are not clearly erroneous. It is evident, also, that this determination comports with the language of the guaranty agreement and with practice in similar cases.
 
 
 17
 The provision of the guaranty agreement that Eastern breached does not specifically provide that such a breach nullifies the SBA's guaranty. Significantly, at least two other provisions of the agreement explicitly so provide.[3] This might suggest that the SBA does not consider the sort of breach Eastern committed here to be so damaging to the SBA's programs as other sorts of breaches. Cf. Valley View Shopping Center Ltd. v. United States, 535 F.2d 42, 46, 210 Ct.Cl. 89 (1976) (ambiguities in SBA contract will be construed against the SBA). Considering the language of the guaranty agreement in combination with the SBA's history of treating breaches, Eastern could not reasonably be expected to have known that a breach of paragraph 8--restricting any side fees--would lead to repudiation of the guaranty. Rather, Eastern reasonably would have expected that repudiation might well be limited to the explicit circumstances described in the guaranty agreement and foreshadowed by precedent.
 
 
 18
 Many of the cases that validate an SBA repudiation of its guaranty involve breaches of provisions expressly declared to be conditions precedent to the SBA's obligation. See, e.g., Royall Nat'l Bank v. United States, 566 F.2d 1151, 1153, 215 Ct.Cl. 349 (1977); Union State Bank v. Weaver, 526 F.Supp. 29, 32 (S.D.N.Y.1981). The SBA argues, however, that Eastern's breach must be understood as material even if there is no case authority to the same effect in similar circumstances. According to the SBA, the present case is unique and egregious because "this was the first time the SBA had been faced with a high-ranking bank official pleading guilty to criminal charges concerning the handling of a guaranteed loan." United States Reply Brief at 4.[4] We do not dispute this point but agree with Eastern that this aspect alone does not make the breach material. The materiality of the breach does not depend on the success of a related criminal prosecution. Further, we note that the crime charged was a strict liability offense, and the guilty plea led only to a fine of $1,000 to be donated to charity; the sentencing judge concluded that the defendant did not exhibit dishonesty or bad faith. In any event, there is a difference between serious misconduct and a material breach of contract.
 
 
 19
 The SBA suggests that First Nat'l Bank v. United States, 6 Cl.Ct. 241 (1984); Union Nat'l Bank v. Weaver, 604 F.2d 543 (7th Cir.1979); Union State Bank v. Weaver, 526 F.Supp. 29 (S.D.N.Y.1981) and United States v. Acme, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), all support its conclusion that repudiation of the guaranty is appropriate. We disagree. The three cases dealing with SBA guarantees (First Nat'l Bank, Union Nat'l Bank and Union State Bank ) all approved repudiations by the SBA after the lender violated a guaranty obligation that the guaranty agreement or other controlling provisions made an express condition precedent to SBA liability. See First Nat'l Bank, 6 Cl.Ct. at 243 (regulations specify that the "SBA will not participate in loan guarantees if the proceeds are used to finance a property purchase from a bank director"); Union Nat'l Bank, 604 F.2d at 545 (the loan agreement was "clear and unambiguous ... [making] SBA's obligation to purchase the ... loan conditional upon the Bank's payment of the guaranty fee within five days of the initial loan"); Union State Bank, 526 F.Supp. at 31 ("payment of guaranty fee [is] a condition precedent to SBA liability"). In the present case, on the contrary, Eastern violated a provision notably lacking any language suggesting that it was a condition precedent to the guaranty obligation.
 
 
 20
 In Acme, the Supreme Court approved the government's repudiation of a contract to purchase rifles after the government concluded that the seller had violated anti-kickback statutes. The Court recognized that such violations would necessarily add to the government's costs and undermine the reliability of the performance of the specific contract at issue. See Acme, 385 U.S. at 143-45, 87 S.Ct. at 354-55. Such concerns are not present here. The essential point is that Eastern's violation did not restrict the flow of funds to borrowers or limit the borrowers' abilities to repay the guaranteed loans.[5]
 
 
 21
 We recognize the interest the SBA has in operating loan-guaranty programs pursuant to its regulations. This interest does affect an analysis of whether a breach is material; however, this interest does not mandate that every violation of a term of the guaranty be deemed material. In light of the language of the SBA's own guaranty agreement and the past practice of the SBA in determining whether or not a guaranty should be repudiated, we conclude that the district court's finding of no material breach is not clearly erroneous.
 
 III.
 The judgment of the district court is
 
 22
 AFFIRMED.
 
 
 
 [1]
 The relevant provision of the guaranty agreement stated, in its entirety:
 
 
 [8]
 Fees or Commissions. Lenders shall not require certificates of deposit or compensating balances and shall not directly or indirectly charge or receive a bonus, fee, commission or other payment or benefit in connection with making or servicing any loan, except reimbursement for charges or expenses incurred or compensation for actual services rendered
 Plaintiff's Exhibit 6 (1978 Guaranty Agreement p 8).
 
 
 [2]
 The side loans apparently were structured so that Eastern delivered a cashier's check to the borrower, who then endorsed it back to Eastern
 
 
 [3]
 For example, paragraph 4 of the guaranty agreement states:
 SBA shall not be obligated to purchase the guaranteed portion of the outstanding balance of the loan if the SBA determines that lender's failure to provide timely and accurate information caused any substantial harm to the government.
 Plaintiff's Exhibit 6 (1978 Guaranty Agreement p 4). See also id. at p 5 (specifically providing that the SBA may repudiate a guaranty where lender fails timely to pay guaranty fee).
 
 
 [4]
 On April 15, 1983, Eastern's Executive Vice-President, Donald Starks, pleaded guilty to one count of violating 18 U.S.C. Sec. 215, a misdemeanor
 
 
 [5]
 The SBA also argues that Eastern breached a "duty of full and fair disclosure"--a dereliction that permits the SBA to repudiate the guaranty. However, the SBA does not explain, nor do we discern, how such a duty would alter the essential inquiry: was Eastern's (admitted) violation of certain terms of the agreement a "material breach" permitting the SBA to repudiate its guaranty?