ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Laguna Construction Company, Inc. | ) ASBCA No. 58324 |
| | ) |
| Under Contract No. FA8903-04-D-8690 | ) |

APPEARANCE FOR THE APPELLANT:  Carolyn Callaway, Esq.
                                Carolyn Callaway, P.C.
                                Albuquerque, NM

APPEARANCES FOR THE GOVERNMENT:  E. Michael Chiaparas, Esq.
                                  DCMA Chief Trial Attorney
                                 Gregory T. Allen, Esq.
                                  Trial Attorney
                                  Defense Contract Management Agency
                                  Chantilly, VA

OPINION BY ADMINISTRATIVE JUDGE DELMAN ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

Laguna Construction Company, Inc. (Laguna, LCC or appellant) has filed a motion for summary judgment in ASBCA Nos. 57977 and 58324. The government has filed in opposition to this motion, and has also filed a cross-motion for summary judgment limited to ASBCA No. 58324. We address the motions under ASBCA No. 58324 herein. Appellant's motion under ASBCA No. 57977 will be addressed separately. We have jurisdiction under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

1. The Air Force Center for Environmental Excellence (AFCEE or government) awarded to appellant Contract No. FA8903-04-D-8690, one of twenty-seven contracts for Worldwide Environmental Remediation and Construction (WERC) in November 2003 (R4, tab 1 at 1-34).

2. Under this contract, LCC received 16 cost-reimbursable task orders (TOs) from the government to perform work in Iraq (compl. ¶ 14). Concurrent with the issuance of these TOs, the United States was engaged in contingency operations in Iraq as defined by FAR 2.101.

3. The contract contained FAR 52.215-2, AUDIT AND RECORDS–NEGOTIATION (JUN 1999); FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002)–ALTERNATE 1 (FEB 1997); FAR 52.233-1, DISPUTES (JUL 2002)–ALTERNATE 1 (DEC 1991); FAR 52.244-2, SUBCONTRACTS (AUG 1998); and FAR 52.244-5, COMPETITION IN SUBCONTRACTING (DEC 1996) (R4, tab 1 at 25-29).

Relevant TOs and Subcontracts

4. TO 0002 was awarded to LCC on 26 March 2004, with an estimated cost-plus-fixed-fee of $19,511,325 to renovate and construct the Ministry of Defense headquarters complex located in Baghdad, Iraq (compl. ¶ 253; R4, tabs 2, 50). LCC awarded Subcontract 2004-007-SUB4, dated 13 October 2004, to Tigris River Company (Tigris) for labor services and supplies for the Ministry of Defense project with a not-to-exceed price of $250,000. LCC issued ten change orders to the subcontract totaling $616,087. (Compl. ¶¶ 214-16, 294-95)

5. The government awarded TO 0006, dated 25 June 2004, to LCC for Phase II construction of An Numaniyah Military Base and to construct a bridge. The total amount of the TO was $40,843,175. (Compl. ¶ 391) Under this TO appellant awarded Subcontract 2004-015-SUB14 to Yacoub & Ramzi Snobar (Snobar) on 6 December 2004 in the amount of $1,860,000. Three change orders were issued to the subcontract in the total amount of $2,455,175. (Supp. R4, tab 83)

6. The government awarded TO 0012 to LCC on 21 April 2005 with an estimated cost-plus-fixed-fee of $8,589,474, to provide planning and phased construction services at Phoenix Base, Iraq (R4, tab 6). LCC awarded Subcontract 2005-009 012-SUB11, dated 15 May 2006, to Mercury Development Company (Mercury Development) for constructing an office building and convoy area at Phoenix Base at the fixed-price of $454,600. LCC issued four change orders to the subcontract totaling $379,885. (Compl. ¶¶ 492-93)

7. LCC awarded a number of subcontracts to the New Millennium Company (New Millennium) under TO 0012. LCC awarded Subcontract 2005-009 012-SUB01, dated 11 March 2005, to New Millennium for Convoy Area Upgrades – Phoenix Base at the not-to-exceed total of $478,800. LCC issued ten change orders to this subcontract totaling $2,315,147. (Compl. ¶¶ 429-30) LCC awarded Subcontract 2005-009 012-SUB05, dated 12 May 2005, to New Millennium for the Base Gym Project – Phoenix Base at a fixed-price of $587,350. LCC issued one change order to the subcontract totaling $650. (Compl. ¶¶ 461-62) LCC awarded Subcontract 2005-009 012-SUB06, dated 19 May 2005, to New Millennium for Guest Quarters at Black Hawk – Phoenix Base at the fixed-price of $1,267,000. LCC issued four change orders to the subcontract totaling $253,972. (Compl. ¶¶ 466-67) LCC awarded Subcontract 2005-009 012-SUB07, dated 30 May 2005, to New Millennium, for Base Power Generation – Phoenix Base at the

2

fixed-price of $1,476,000. LCC issued two change orders to the subcontract totaling $719,655. (Compl. ¶¶ 472-73) LCC awarded Subcontract 2005-009 012-SUB08, dated 30 May 2005, to New Millennium for renovations to the Iraqi Armed Forces Staff College at the fixed-price of $933,690. LCC issued seven change orders to the subcontract totaling $2,007,370. (Compl. ¶¶ 477-78) LCC awarded Subcontract 2005-009 012-SUB09 dated 15 August 2005, to New Millennium for building of New DFAC at the fixed-price of $1,841,000. LCC issued nine change orders to the subcontract totaling $958,144. (Compl. ¶¶ 484-85)

8. The government awarded TO 0014 to LCC on 10 June 2005 in the amount of $20,555,941 to construct two Iraqi Police Commando Facilities, Commando Sites 4 and 6, at the Ministry of Defense Headquarters, Baghdad, Iraq (supp. R4, tab 58). LCC awarded Subcontract 2005-010 014-SUB01, dated 28 May 2005, to Hozan General Construction Company for "Commando Site 4 (Site Work, Renovation Buildings, Brigade Building and Dinning [sic] Hall)" in the total amount of $8,950,710. LCC issued thirteen change orders under this subcontract in the total amount of $8,609,400. (Compl. ¶¶ 508, 511) LCC awarded Subcontract 2005-001 014-SUB04, dated 24 May 2006, to Tigris to "Add T-Wall Separation for Detention Facility, Baghdad, Iraq" in the amount of $129,000. LCC issued three change orders under this subcontract in the total amount of $519,290. (Compl. ¶¶ 593-94)

9. The government awarded TO 0015 to LCC on 12 July 2005 at an estimated cost-plus-fixed-fee of $17,777,545 to construct the Baghdad Police College, consisting of two classroom buildings, two barracks, an officers' club and the construction of an improvised explosive device (IED) training course (compl. ¶ 615). LCC awarded Subcontract 2005-017 015-SUB07, dated 29 March 2007, to Aridh Al-Sahil Company LTD (Aridh) for water supply work at the Baghdad Police College in the amount of $920,000. LCC issued a number of change orders to Aridh under this subcontract. (Compl. ¶¶ 721-40) LCC issued Subcontract 2005-017 015-SUB03 to New Millennium on 16 August 2005 for construction of two classroom buildings for the fixed-price of $4,023,762 (compl. ¶ 619).

10. The government awarded TO 0020 to LCC on 21 December 2005 for construction and initial provisioning of a station defense training facility and an IED course/track at various locations in Iraq for the total estimated cost-plus-fixed-fee of $11,972,902 (supp. R4, tab 65; compl. ¶ 793). LCC awarded a subcontract, dated 16 December 2005, to Snobar in the amount of $3,690,000 for IED Training and Station Defense Training Facilities, Mosul, Iraq (compl. ¶ 796).

Kickbacks

11. In or around January 2008, the government initiated an investigation into allegations that LCC employees solicited and received kickbacks from subcontractors on

its Iraq projects. Appellant's project manager, who later became construction manager and ultimately area manager, was interviewed by the Federal Bureau of Investigation (FBI) and Defense Criminal Investigative Service (DCIS). The results of interviews were summarized in a letter from the Special Agent in Charge, FBI Albuquerque Division, to Joseph S. Satagaj, Jr., Associate Counsel, Defense Contract Management Agency (DCMA), Contract Integrity Center – Dallas, dated 6 October 2010. According to the investigation, LCC's manager provided as follows:

> He advised Special Agents that he was first employed by LCC as a Project Manager in March 2005, then as a Construction Manager, then subsequently as the Area Manager for LCC until December 2007. During the interviews he admitted receiving kickbacks as an LCC employee and as a result of LCC subcontract awards, from a number of subcontractors in Iraq....
>
> ....
>
> The kickbacks paid by employees of these companies totaled over $450,000 and were paid by these subcontractors in order to facilitate both the awarding of contracts as well as the timely payment of invoices. In at least two cases, the kickback was paid by the owner of the company. [The] owner of Mercury Development, paid [him] $100,000 in order to facilitate Mercury Development getting subcontract work. [The] owner of Aridh Al-Sahil Company Ltd paid [him] $150,000 in order to facilitate Aridh Al-Sahil Company Ltd getting subcontract work as well as for getting invoices paid in a timely manner. [He] admitted specifically to receiving a kickback for the paving work Aridh Al-Sahil performed on the Baghdad Police College contract as well as from Hozan General Construction Company Ltd. for work performed at the Ministry of Defense, Commando Site 4.

(Supp. R4, tab 87 at 1157-58) According to the FBI letter, he also identified a number of the TOs during the time he received kickbacks, including TOs 0012, 0014 and 0015 (*id.* at 1158).

12. On 13 May 2010, the United States Attorney for the District of New Mexico filed a criminal information against this project manager. The information alleged that he conspired "[f]rom at least as early as April 2005, until in or about

4

March 2008," to violate 41 U.S.C. § 53,[1] the Anti-Kickback Act, "by knowingly and willfully soliciting, accepting, and attempting to accept one or more kickbacks, specifically: money, payments, and commissions, in connection with [Laguna's] award of subcontracts relating to prime contracts awarded by the United States to [Laguna]...." (Supp. R4, tab 84 at 1132)

13. On 1 October 2010, this project manager pled guilty to Count One of the 13 May 2010 criminal information. That count charged him with "[c]onspiracy to pay or receive kickbacks, in violation of 18 U.S.C. § 371 and 41 U.S.C. § 53." (Supp. R4, tabs 86, 89)

14. As a part of his guilty plea agreement, he acknowledged as follows:

> From at least as early as April 2005, until December 3, 2007, I was employed by [LCC], a New Mexico-based company, and was assigned to its office in Baghdad, Iraq. LCC was a prime contractor providing contracting services to the United States. Projects in Iraq on which LCC served as prime contractor included, but were not limited to: construction, restoration, and renovation projects involving the Multi-National Security Transition Command-Iraq (MNSTC-I) Phoenix Base; the Iraq Ministry of Defense; the Baghdad Police College; Civilian Police Assistance Training Team (CPATT); Medical Aid Stations; the Independent Electoral Commission Building; the International Zone Fire Station and the International Zone Sanitary Sewer System, located in Baghdad; the An Numaniyah Military Base and the An Numaniyah Military Training Base West Pods, located in An Numaniyah; and the Charlie Forward Operating Base (CFOB), located in Al Hillah. These projects were under the authority of the Air Force Center for Engineering and the Environment (AFCEE)....

> LCC hired numerous subcontractors to complete the work on these projects. Under the terms of LCC's cost-plus contracts with DOD, LCC would submit its subcontractors' invoices to DOD, which subsequently would reimburse LCC for the amounts of the invoices plus

---

[1] 41 U.S.C. § 53 was subsequently re-codified as 41 U.S.C. § 8702, effective 4 January 2011.

a percentage. LCC, in turn, would reimburse its subcontractors for the amounts specified in their invoices.

From April 2005 until March 2008, I agreed with others to accept kickbacks from LCC subcontractors, specifically: money payments for the purpose of improperly facilitating the award of LCC subcontracts and favorably rating the performance of subcontractors.... In order to make contract funds available for kickbacks, I would cause subcontractors to submit inflated invoices to LCC for presentment to the government, but to agree to accept lesser amounts than those specified in their subcontractor invoices so that contract funds were available to pay me kickbacks. Through this practice, I caused the subcontracts paid by the United States Government to be inflated by the amounts I would receive as kickbacks. I am aware that I caused LCC to submit kickback-inflated billings from its corporate headquarters in New Mexico to AFCEE in Texas causing an over-billing to the United States Government, namely, DOD, of $847,904.00.

(Supp. R4, tab 86 at 1149-50)

15. On 28 February 2012, a federal grand jury in the United States District Court for the District of New Mexico issued Criminal Indictment No. 12-413 MV (Indictment No. 12-413) against three principal officers of LCC and four principal officers of LCC subcontractors on the WERC contract. The LCC officers indicted were (1) the president of LCC during LCC's performance of the WERC contract who was in charge of all of LCC's construction operations, including those involving wartime reconstruction efforts in Iraq and Jordan; (2) the executive vice president and chief operating officer of LCC for LCC's reconstruction efforts in Iraq (hereafter vice president for operations); and (3) LCC's contract compliance manager. (Supp. R4, tab 88 at 1161)

16. The four subcontractor principals indicted by the grand jury were the two owners of Snobar; the owner of Mercury Development, a Lebanese contractor that received multiple reconstruction contracts from LCC and who also worked for New Millennium; and the owner of Tigris (supp. R4, tab 88 at 1162).

17. Indictment No. 12-413 alleged that Laguna's officers and employees received kickbacks for awarding construction subcontracts to certain subcontractors on task orders issued under the WERC contract. It asserted one count of wire fraud

6

conspiracy, seventy-four counts of wire fraud, one count of illegal kickbacks, one count of money laundering conspiracy, eleven counts of money laundering, and three counts of income tax evasion. (Supp. R4, tab 88 at 1164-91)

18. On 2 July 2013, the United States Attorney for the District of New Mexico filed a criminal information against appellant's vice president for operations. The information alleged that from in or about December 2004 through on or about February 2009, he and others conspired to defraud the United States by providing, soliciting, and accepting kickbacks in return for improperly providing favorable treatment to certain subcontractors in connection with the award of subcontracts by LCC to those subcontractors under the WERC contract. It specifically identified numerous kickback payments to him from Snobar and Mercury Development. Total kickbacks paid by subcontractors were alleged to be at least $1,687,310. (Supp. R4, tab 90 at 1204-08)

19. On 2 July 2013, appellant's vice president for operations pled guilty to Counts 76 and 91 of the indictment. Count 76 was for solicitation and receipt of kickbacks, a violation of 41 U.S.C. § 53. Count 91 was for federal income tax evasion, a violation of 26 U.S.C. § 7201. He also pled guilty to the above information, conspiracy to provide, solicit, and accept kickbacks, a violation of 18 U.S.C. § 371. (Supp. R4, tabs 88, 90, 91, 92 at 1210).

20. In the plea agreement of appellant's vice president for operations, he admitted that he and others submitted AFCEE proposals under the WERC contract that included a "competition certification" under which LCC certified "that all subcontracting will be done using competitive bidding procedures." He identified several specific proposals under the WERC contract where he and others had made false statements about using competitive bidding procedures. These were: a 4 January 2005 proposal for the An Numaniyah Base Renovations Project; a 1 March 2005 proposal for the Phoenix Base Upgrade project; a 15 March 2005 proposal for the Police Service Academy Project; an 18 April 2005 proposal for the Commando Satellites and Site 4 and Site 6 Project; and a 21 September 2005 proposal for the Station Defense Training Facility and Improved Explosive Device Course Track Project. (Supp. R4, tab 91 at 1215)

21. In the plea agreement, he also admitted that:

> [D]uring and in conjunction with the administration of the LCC Iraqi reconstruction prime contracts and subcontracts, I accepted numerous kickbacks from defendants...in return for giving them favorable treatment in connection with the awards of subcontracts under the WERC and HERC. I also have personal knowledge of [Laguna's president]'s

7

acceptance of numerous kickbacks.... These subcontractors were willing to pay us kickbacks because we circumvented the fair, open, and competitive bidding process required by the FAR and LCC's policies and procedures, and instead directed subcontracts to these favored subcontractors.

...To ensure that these subcontractors received favored treatment in the award of the various HERC and WERC subcontractors, [Laguna's president] and I subverted the bidding process....

....

...I improperly manipulated the contracting process in order to ensure that the subcontractors who paid us kickbacks were awarded subcontracts. [Laguna's president] knew that I was not following the open, fair, and competitive bidding practices required by the FAR. Through this process [we] circumvented the competitive bidding process required by the FAR and LCC's own policies and procedures, and I was able to direct subcontracts to companies that were willing to pay us kickbacks.

(Supp. R4, tab 91 at 1219-20)

LCC's Claim and Appeal

22. In February 2009, the Defense Contract Audit Agency (DCAA) began an audit of LCC's incurred costs for its fiscal year (FY) 2006 (compl. ¶ 32). On 17 March 2011, DCAA issued Forms 1, Nos. 2011-002 through 2011-005 disapproving a total of $17,459,674 of subcontract costs (R4, tabs 26-29). On 4 August 2011, DCAA revised the Forms 1, redesignated them as Nos. 2011-002(a) through 2011-005(a), and disapproved a total of $17,823,506 of subcontract costs (R4, tabs 32-35).[2]

23. On 6 April 2012, DCAA rejected 14 LCC vouchers totaling $3,031,925 on TOs 0002, 0005, 0010, 0011, 0012, 0014, 0015, 0017, 0018, 0020, and 0022 based on the revised Forms 1 above (R4, tab 40 at 290; supp. R4, tab 82).

---

[2] For reasons discussed herein, we need not address DCAA's methodology and computation of the disapproved costs.

24. On 21 May 2012, LCC submitted a "Certified Claim under Contract No. FA890304D8690, Task Orders 002, 0005, 0010, 0011, 0012, 0014, 0015, 0017, 0018, 0020, 0022" on behalf of LCC to the Administrative Contracting Officer (ACO). That claim requested a decision, *inter alia*, "authorizing payment to Laguna of the improperly withheld sum certain of $2,874,081." (R4, tab 40 at 283-84)

25. The ACO did not issue a decision. On 18 September 2012, LCC submitted a notice of appeal to the Board based upon the deemed denial of its claim. The Board docketed the appeal as ASBCA No. 58324.

Pleadings and the Affirmative Defense

26. Appellant's complaint was filed on or about 26 October 2012, and the government's answer was filed on or about 2 January 2013. After Laguna's vice president for operations pled guilty in July 2013, the government moved to amend its answer to include the Affirmative Defense of fraud, as follows:

### *The Fraud By LCC Officers and Employees*

....

> The Government is not liable for LCC's claim...because of LCC's breach of Contract No. FA8903-04-D-8690 when its principal officers and employees solicited and accepted kickbacks for awarding subcontracts under task orders issued under that contract, which constituted fraud against the United States.

Appellant objected to the government's motion. The Board granted the government's motion to amend its answer. *Laguna Construction Company*, ASBCA No. 58324, 13 BCA ¶ 35,464.

## DECISION

Motion to Strike Documents

Appellant moves to strike the following documents and the portions of the government's cross motion that address them. These documents were attached to the government's motion and were tendered as part of the government's Rule 4 file supplement:

9

**Tab 84**: Criminal Information for Ismael Salinas, a.k.a. Mike Salinas, Criminal No. 10-1383, United States District Court for the District of New Mexico, dated 13 May 2010.

**Tab 85**: Complaint for Forfeiture *In Rem*, United States v. 11510 Anaheim Ave. NE, Albuquerque, NM 87122 and Bradley Christiansen and Sara Christiansen, claimants, Civil No. 10-647, United States District Court for the District of New Mexico, filed 9 July 2010.

**Tab 86**: Plea Agreement for Ismael Salinas, a.k.a. Mike Salinas, to plead guilty to conspiracy to pay or receive kickbacks, Criminal No. H-10-438, United States District Court for the Southern District of Texas, dated 1 October 2010.

**Tab 87**: Letter from Federal Bureau of Investigation, Albuquerque Division, to Joseph S. Satagaj, Jr., DCMA Contract Integrity Center, concerning illegal kickbacks from subcontractors to employees of Laguna Construction Company, Inc., dated 6 October 2010.

**Tab 88**: Criminal Indictment for Neal Kasper, Bradley G. Christiansen, Sara Christiansen, Tiffany White, Ramzi Snobar, Yacoub Snobar, Mustapha Ahmad, and Ali-Ardhi, Criminal No. 12-413, United States District Court for the District of New Mexico, dated 28 February 2012.

**Tab 90**: Criminal Information for Bradley G. Christiansen, Criminal No. 12-413 MV, United States District Court for the District of New Mexico, dated 2 July 2013.

**Tab 91**: Plea Agreement for Bradley G. Christiansen, Criminal No. 12-413 MV, United States District Court for the District of New Mexico, dated 2 July 2013.

The government has withdrawn tab 85 (gov't opp'n to mot. to strike at 2). We address the remaining documents below.

10

The Indictment and the Criminal Informations (Supp. R4, tabs 84, 88, 90)

Laguna objects to the admission of these documents for the truth of the matter stated therein on the ground of hearsay, but does not object to their admission "for the limited purpose of showing they were issued, the criminal charges included therein, and the persons charged" (app. reply to gov't opp'n to strike at 2). Indeed, the government cannot reasonably tender these documents for more; these documents provide only charges or allegations and, perforce, they are not admissible for the truth of the matter asserted therein.

These documents are not stricken, but they are admitted solely for the limited purposes stated above.

The Plea Agreements (Supp. R4, tabs 86, 91)

Appellant's chief contention is that the plea agreements are inadmissible for the truth of the matter stated on the ground of hearsay under the Federal Rules of Evidence (FED. R. EVID.) as applied in the federal courts. The short answer to this is that the ASBCA is an administrative agency board that is not bound by the FED. R. EVID. as applied in the federal courts. Rather, we are bound to follow our own published Rules, which insofar as pertinent, permit the admission of evidence in Board proceedings "under the Federal Rules of Evidence or in the sound discretion of the presiding Administrative Judge or examiner." Rule 10(c).[3] This sound discretion includes the acceptance of hearsay under appropriate circumstances. *C.F. Electronics, Inc.,* ASBCA No. 43212, 95-2 BCA ¶ 27,719 at 138,136; *see E.R. McKee v. United States,* 205 Ct. Cl. 303, 310 (1974) ("In an administrative [Interior Board of Contract Appeals] hearing 'rank hearsay' not only is admissible, depending on the applicable regulations, if any, but can constitute substantial evidence if sufficiently convincing to a reasonable mind.").

We find sufficient indicia of trustworthiness in this evidence under the circumstances. The admissions of illegal activity cited in these documents were made by the putative defendants under oath and with the advice of counsel, and subjected them to significant criminal penalties. Indeed, appellant does not offer any affidavit, or cite to any other evidence of record disputing the accuracy of these plea agreement admissions. Rather, appellant asserts that these admissions are redundant, immaterial or irrelevant to the appeals. We do not agree. The admissions in the plea agreements provide context to the guilty pleas, and in accordance with the government's affirmative defense, help explain and support how Laguna breached the contract (*see*

---

[3] Effective 21 July 2014, the Board's Rules were revised and renumbered. Fed. Reg., vol. 79, No. 139 (July 21, 2014). *See* ASBCA website, *www.asbca.mil.* We cite to the revised Rule here.

*infra*). The Board admits these plea agreements into evidence for the truth of the matter stated, and appellant's motion to strike them is denied.

## FBI Letter of Investigation to DCMA (Supp. R4, tab 87)

Appellant objects, on the grounds of hearsay, to the FBI letter to DCMA dated 6 October 2010, which sets forth the FBI's findings regarding its investigation. Unlike the plea agreements, this document does not contain any signed, sworn statement of the accused. Rather, it contains government summaries of what was purportedly stated by the accused during various interviews. On the other hand, the excerpts from the letter cited by the government (gov't mot. at 14-16), a portion of which we have cited herein (SOF ¶ 11), relate to the accused's receipt of kickbacks under the contract. This information is generally corroborated by his guilty plea and plea agreement. We also note that appellant does not offer any evidence disputing the accuracy of this evidence. We believe that these excerpts cited by the government contain sufficient elements of trustworthiness so as to be admissible for the truth of the matter asserted, and appellant's motion to strike these excerpts is denied.

However, this FBI letter also contains matters of questionable relevance to this appeal, including the subject's purported encounter with Customs and Border Protection officers and a claimed consensual search of a residence. We decline to admit this material due to lack of relevance.

In conclusion, except as otherwise stated herein, appellant's motion to strike documents is denied.

## The Cross-Motions for Summary Judgment

A party is entitled to summary judgment if it can show that there are no disputes of material fact and it is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). We believe there are no disputes of material fact here, and that the appeal is amenable to summary judgment.

It is undisputed that in April 2012, the DCAA rejected, and the government declined to pay 14 LCC invoices under various TOs under this contract, based upon the DCAA's findings and calculations under the Forms 1 as revised (SOF ¶ 23). Appellant contends that the government's disapprovals, by nature and amount, were unsupported and the government breached the contract due to its failure to pay the invoices. Assuming, *arguendo*, that appellant is correct, nevertheless it is not entitled to recover for reasons stated below.

In *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004), the Court summarized the well settled principle of antecedent breach:

> When a "party to a contract...is sued for its breach [it] may ordinarily defend on the ground that there existed, at the time [of the breach], a legal excuse for nonperformance...." In resolving disputes among parties who each claim that the other has breached, courts will "[o]ften...impose liability on the party that committed the *first material breach*." [Citation omitted]

We conclude below that appellant committed the first material breach under this contract, which provided the government with a legal excuse for not paying appellant's invoices.

Every contract contains a convenant between the parties to perform in good faith and fair dealing. A failure to fulfill this duty is a breach of contract. *Metcalf Construction Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). We believe an essential element of this convenant is the duty of each party to perform with integrity. A breach of such a duty is not only a breach of contract but a betrayal of trust, and vitiates the reasonable and justifiable expectation of the parties in the performance of that contract.

Under the cost-reimbursable TOs of this contract, appellant's officials pled guilty to taking kickbacks, causing appellant's vouchers to the government to be inflated to cover the payment of these kickbacks during the course of contract performance. We must first determine whether this criminal conduct may be imputed to Laguna.

The aforementioned criminal acts were performed by appellant's project manager and by its vice president of operations, both of whom were operating under this contract and within the scope of their employment. This supports the imputation of their actions to Laguna. *See Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348, 1370 n.25 (Fed. Cir. 2013); *see also United States v. Acme Process Equipment Co.*, 385 U.S. 138, 147 (1966) ("Since Acme selected those agents to carry on its business in obtaining and performing government contracts, there is no obvious reason why their conduct in that field should not be considered as Acme's conduct, particularly where it touches the all-important subject of kickbacks.").

Accordingly, we conclude that Laguna breached its duty under this contract to perform in good faith and fair dealing. In addition, insofar as Laguna's vouchers to the government were improperly inflated to include the payment of kickbacks, its

13

vouchers also did not reflect allowable and reimbursable performance costs, which was a breach of the Allowable Cost and Payment clause in the contract (SOF ¶ 3).

Next, we address whether these breaches were material. Kickbacks are fraudulent and "any degree of fraud is material as a matter of law." *Christopher Village*, 360 F.3d at 1335. That the government has not proven that kickbacks were paid under every TO or under every voucher does not render the fraud any less material. *See Joseph Morton Co. v. United States*, 757 F.2d 1273, 1278 (Fed. Cir. 1985) ("balancing test" between the fraudulent act and the work free of fraud is contrary to precedent). Appellant's breaches here were material.

## CONCLUSION

We conclude that Laguna materially breached the WERC contract through the kickbacks taken by its agents and its billings to the government based on amounts inflated by their kickbacks. We conclude that these criminal acts constituted a first material breach, and this first material breach excused the government from subsequently paying appellant's invoices. Accordingly, we grant the government's cross-motion for summary judgment under ASBCA No. 58324, and deny appellant's motion for summary judgment.

ASBCA No. 58324 is denied.

Dated: 23 September 2014

JACK DELMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

14

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58324, Appeal of Laguna Construction Company, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
